Filed 12/15/16

## CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JASON EVERETT THOMPSON et al.,<br><br>    Plaintiffs, Cross-defendants and Respondents,<br><br>v.<br><br>DEAN ASIMOS,<br><br>    Defendant, Cross-complainant and Appellant. | A140096<br><br><br>(City & County of San Francisco Super. Ct. No. CGC-11-514980) |

Jason Everett Thompson founded a consulting firm and operated it as a sole proprietorship under the dba Wired Real Estate Group (WREG) with the aim of advising clients in a niche internet infrastructure industry called "colocation," sometimes, but not always, performing services that required WREG to have a real estate broker's license. Because Thompson did not have a broker's license when he founded WREG, he decided to collaborate with someone who did, Dean Asimos. To memorialize the terms of their collaboration, Thompson and Asimos adapted a standard form independent contractor agreement typically used by real estate brokers and agents.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I.B.3, II.A., and II.B.3.c.

1

The form agreement Thompson and Asimos used turned out to be a poor fit for the unique business context in which WREG operated. A series of disputes arose between the two of them concerning, among other things, alleged underpayment of commissions and alleged failure to comply with regulatory requirements governing real estate brokerage. These disputes led to litigation, with the parties suing each other on various breach of contract and business tort theories. After a bench trial, Thompson prevailed in all respects, obtaining a substantial damages award, plus an award of attorney fees. Asimos took nothing, and now appeals from the judgment.

In the published portion of this opinion, we affirm the trial court's rejection of all of Asimos's claims against Thompson and its determination of liability against Asimos for breach of contract, but vacate the damages award and remand for recalculation and clarification of the amount awardable. In the unpublished portions of the opinion we deny Thompson's motion to dismiss the appeal under the appellate disentitlement doctrine, and affirm the trial court's liability findings against Asimos on Thompson's claims for unfair competition and trademark infringement.

## I. BACKGROUND

In a terse four-page Statement of Decision, the trial court framed the business context giving rise to this lawsuit as follows: While "most real estate agents deal with residential or commercial property[,] [Thompson] deals with the highly specialized kind of real estate needed to house the hardware which makes the internet work. He does business under the name Wired Real Estate Group. Initially Wired Real Estate Group was a consulting business. Thompson sold his advice and was paid an hourly rate, an activity not regulated by the California Department of Real Estate (DRE)." A great deal is packed into these background observations about the business setting. To illuminate how the business circumstances bear on our analysis of the trial court's disposition of the parties' claims, we begin with a summary of the evidence presented at trial.

2

## A. Evidence Presented at Trial

### 1. *Thompson's Consulting Business, WREG*

Thompson, a civil engineer with a background in the power plant industry, testified that in the early 2000s, he was working for Equinix, a company operating in what was then a nascent internet-infrastructure industry called "colocation services." Colocation, according to Thompson, means multitenancy; and colocation data services means advice and consulting offered to companies involved in managing or locating themselves in "data centers," buildings which house computer servers and other networking equipment, all of which must be powered, connected to the internet, and cooled in a highly specialized way.

According to Thompson, companies needing large-scale internet storage (i.e., "cloud") capability and high-speed broadband access to the internet tend to cluster together in data center colocation arrangements under the umbrella of "management services agreements." To advise such companies, Thompson left Equinix to start his own independent colocation services consulting business. In 2005, when he left Equinix, Thompson was not set up to take advantage of real estate brokerage opportunities in his colocation services consulting practice. He was a licensed real estate agent, but he was not a licensed real estate broker.

In 2008, Thompson met Asimos, a real estate broker whose expertise was mostly in residential real estate. Asimos had little knowledge of colocation services, but he did have a real estate broker's license. Seeing the potential for mutual advantage, Thompson and Asimos, after brief discussion, "pretty quickly" agreed to enter into what would become a two-year business collaboration.

On June 4, 2008, Thompson and Asimos signed the first of two successive independent contractor agreements governing their relationship (the "ICAs"), the first covering the period from inception through December 31, 2008, and the second, negotiated in March 2010 but covering the period January 1, 2009 through September 30, 2010. The renewal contract included two written amendments, added as attachments, and made a number of revisions to the body of the contract. The most significant among these

3

revisions was language broadening the scope of what the parties considered to be commission-generating transactions covered by the ICAs.

Just before he and Asimos signed their first contract, Thompson established a sole proprietorship known by the dba WREG. At the same time, he issued a press release, displaying in the release the trademarked name, WREG, and announcing that he was bringing a new consultant onto "the Wired Real Estate Group team." He also filed a fictitious business name statement for WREG in the City and County of San Francisco and opened a bank account in WREG's name at Wells Fargo Bank.

### 2. *The Issue of DRE Regulation*

On the topic of DRE regulation, the trial testimony of Thompson and Asimos was in accord on three basic points. First, a real estate broker has supervising responsibility over an agent on all real estate transactions for which the agent utilizes the broker's license. Second, if the agent operates through an entity, the broker must register the name of that entity with DRE under the broker's license. And, third, commissions on all real estate transactions requiring a broker's license must be paid directly to the broker, who then distributes the agreed share of commissions to the agent.

Although there was no dispute between Thompson and Asimos as to what the applicable DRE rules were, they disagreed on how these rules applied to WREG. Thompson testified that the consulting aspects of WREG's business do not involve the "[sale], lease or exchange" of real property ("licensed" deals, in his terminology), and thus do not require a real estate broker's license. Because most colocation data services consulting involves brokering of "personal property" or "service[s]," Thompson testified, most of WREG's consulting business is not regulated by DRE.

According to Thompson, Asimos recognized that most of WREG's consulting business was "separate and apart" from its business conducted under the ICAs because he showed no interest in it. To ensure full disclosure of anything Asimos wished to know about WREG's activities, Thompson testified that he regularly sent Asimos detailed "pipeline reports" showing the status of leads, pending deals, and closed transactions for all WREG business. Thompson claimed to have "spent a lot of time explaining these

4

things" to Asimos, but rather than ask follow-up questions, Asimos complained that the pipeline reports had "too much information" and seemed to have "trouble understanding" them.

Asimos, on the other hand, claimed Thompson never disclosed enough about WREG's consulting activities. He said Thompson "never told [him] that he planned to do business [himself] as [WREG] as a consultant." He claimed he expected from the outset that all WREG business would run through him, as indicated by the fact that Thompson assigned him the right to use the WREG name. Asimos testified that, shortly after signing the 2008 ICA, he obtained his own dba for WREG in San Mateo County, and sought to register that dba with DRE by sending in the required DRE registration form. To collect and distribute expected WREG revenues, Asimos testified that he established a bank account at Bank of America. He claimed to have been unaware that Thompson had a separate dba for WREG and a separate bank account, and said he was "shocked" when Thompson began sending him commission checks directly, since the money flow, in his view, was supposed to be the opposite by DRE regulation.

3.      *Meager Commission Revenue and DRE Compliance Problems*

In a harbinger of problems to come, 2008 produced no commission revenue at all for Asimos. Thompson described that year as a challenging one due to the recession. At the time, Thompson testified, WREG was pursuing many deals, some on the consulting side, and some "licensed" deals; a few of the consulting deals were completed, but none of the "licensed" deals closed, which is why Asimos received no commission revenue in 2008. On the unregulated side of his business, Thompson said he began discussions in the fall of 2008 with Astound Broadband LLC (Astound) about a colocation arrangement with Amazon, but that deal did not close until late April 2009.

Thompson testified that, in 2009, one of the reasons he was willing to negotiate renewal terms expanding the defined scope of the commission-generating deals covered by the ICA was because his collaboration with Asimos had generated so little for Asimos to that point. The renewal terms did produce an increase for Asimos in commissions received on WREG transactions from the zero commissions received in 2008, but only a

5

modest one. Despite the broadened definition of commission-generating deals, Asimos received only $8,437.17 in commissions in 2009 and 2010.

In total, over the entire course of the Thompson-Asimos collaboration under the ICAs, Thompson testified there were only four commission-generating WREG deals covered by the ICA out of hundreds of leads shown on Thompson's pipeline reports. These deals were for, respectively, I2B, Astound, Travelport and Internap. Of these, Thompson testified, only the I2B deal required the services of a real estate broker. According to Thompson, the Astound, Travelport and Internap deals were not "licensed" deals.

Thompson testified that, after the I2B deal closed in November 2009, there was a delay in obtaining the commission payment because of confusion over WREG's DRE registration status. In his trial testimony, Asimos claimed he mailed DRE a registration form for WREG in August 2008, but never followed up to confirm that WREG had been properly registered. Asimos explained that he sent a second registration form for WREG to DRE—he thought perhaps the first had been lost in the mail—but it was not until November 2009 that he was able to confirm WREG was properly registered.

4.  *The Dispute with Astound Broadband*

In addition to the difficulties Thompson had in collecting WREG's commission from I2B, a second problem with payment of commissions owed arose, but this one proved more difficult to resolve. In February 2010, the DRE sent a "corrective action" letter to Asimos advising him that Thompson was not properly registered with DRE under Asimos's broker's license. Thompson suspected that Astound Broadband, whose colocation deal with Amazon had recently closed, might have made an anonymous complaint about this issue to DRE.

When the Astound-Amazon colocation deal closed, Astound took the position it would only pay a small fraction of the commission WREG had earned, claiming Thompson had limited or no involvement in the Amazon negotiations. Thompson hired a lawyer, Bill Gutierrez of the law firm, Carr McClellan, and on Gutierrez's advice, eventually decided to sue Astound for recovery of WREG's commission. Although

6

Gutierrez made efforts to resolve the matter without suing, "[i]t became evident very early [on] that Astound was going to use real estate licensing as one of their primary defenses."

Thompson testified that even though he viewed the Astound deal as one not requiring a broker's license, he said "I was advised by [Gutierrez] that that was a risk." In light of the legal uncertainty around whether a real estate broker's license was required for the transaction, Gutierrez felt it would be best to "present" the case with Asimos as the plaintiff. Although Asimos was initially reluctant to involve himself in the collection effort, he eventually agreed to assist. At that point, Gutierrez began representing both Asimos and Thompson jointly, and in October 2009 filed a lawsuit against Astound, naming "Dean Asimos dba Wired Real Estate Group" as the sole plaintiff.

When asked at trial to describe the legal defenses Astound pursued in the course of the litigation, Gutierrez confirmed that Astound had checked the DRE records, discovered that WREG had not been registered with DRE at the time its deal with Amazon closed, and used that issue as "a central defense." He also confirmed that lack of involvement by Thompson in the Amazon negotiations was one of the arguments Astound made, but after investigating the issue, he said, he concluded there was no merit to that argument. The lack-of-license issue, on the other hand, "gave strength to the defense" and in light of that "it was not a sure thing" WREG would prevail.

While the Astound lawsuit was pending, in May 2010—only two months after Thompson and Asimos had finalized their negotiation of renewal terms—Thompson gave Asimos notice of termination, ending their collaboration under the ICAs. Shortly thereafter, in June 2010, Thompson obtained his own real estate broker's license. The end of the Thompson-Asimos collaboration led to a series of post-termination disputes. Thompson, for his part, demanded that Asimos immediately cease using the WREG dba he had obtained in San Mateo County and cease holding himself out publicly as WREG's broker. Asimos, for his part, demanded various records from Thompson, including bank statements for the WREG Wells Fargo account so that he could determine the extent of what he believed were "unlicensed" activities that posed a risk to his broker's license.

7

These post-termination disputes were the focal point of the evidence at trial. Asimos accused Thompson of hiding information from him, failing to pay commissions due on undisclosed WREG transactions, and carrying out his WREG consulting activities as an "illegal" side business in violation of DRE regulations. Thompson denied hiding anything from Asimos, claimed he had always been open with Asimos about the extent of WREG's consulting activities, and said the existence of separate bank accounts for WREG—one maintained by Asimos, one maintained by Thompson—simply reflected the fact that both men recognized the money flow for commissions on "licensed" deals was to be handled differently than on unregulated deals.

5.     *Astound Settlement, Termination of ICAs, and Filing of This Lawsuit*

Because of the post-termination disputes between Thompson and Asimos, Gutierrez had the two of them sign a conflict waiver in June 2010. The conflict waiver provided, among other things, that any settlement proceeds in the Astound case would be placed in a Carr McClellan trust account and distributed "(1) in accordance with your joint written instructions; or (2) in accordance with the terms of any order or judgment of an arbitrator or court."

The Astound case eventually did settle, in May 2011, for $155,000—a substantial discount from the $366,000 that Thompson calculated WREG's commission to be. Both Asimos and Thompson consented to the settlement. Of the total $155,000 in settlement proceeds paid by Astound, approximately $55,000 in attorney fees went to Carr McClellan and the net proceeds, $102,911, were deposited into a client trust account maintained by Carr McClellan.

The decision whether to settle for something less than the full value of the claim, as Thompson saw it, was a matter of "judgment." According to Thompson, "because [Astound's] primary defense was real estate licensing, . . . [it] could delay and run up the costs of our litigation to the point where [the case] would have no value." And since there was a non-negligible risk "of someone not understanding the regulations or making these kinds of defenses," he ultimately agreed to take less than half of what he thought he was owed.

8

In August 2011, a few months after the Astound case settled, Asimos filed a Chapter 13 bankruptcy petition. In his bankruptcy petition, Asimos did not list any amount for the Astound settlement as an asset of his bankruptcy estate. He testified that "I explained this to my counsel, exactly what was going on in regards to potential litigation and this—the litigation from . . . Astound, and that there was going to be a court action to resolve that dispute. [¶] So it was in question whether or not that really was an asset, or a liability, or neither."

As of the fall of 2011, Thompson and Asimos remained in a stand-off as to the distribution of funds out of the Carr McClellan trust account.

## B.    Procedural History

### 1.    *Claims Asserted and the Court's Tentative Decision*

On October 11, 2011, Thompson filed the complaint in this action, asserting claims for trademark infringement, unfair competition under the Lanham Act (15 U.S.C. § 1125, subd. (a)), unfair competition under section 17200 of the Business and Professions Code, trade libel, breach of contract, and for declaratory relief. Thompson's breach of contract claim, pleaded in four distinct counts, alleged improper use of the WREG name and trademark, failure to pay commissions, failure to register the WREG dba with DRE, and failure to advise Thompson properly on the requisites for DRE regulatory compliance. Asimos answered and filed a cross-complaint. The cross-complaint alleged causes of action for breach of contract, breach of covenant of good faith and fair dealing, fraud, an accounting, and a declaration of constructive trust.

After a bench trial, on February 15, 2013 the trial court filed a four-page Tentative Decision finding that "Thompson is the prevailing party. The court grant[ed] judgment in favor of Thompson and against Asimos for $316,105, with prejudgment interest to be calculated at the time of judgment. The court further order[ed] a permanent injunction prohibiting Asimos' use in any way of the service mark Wired Real Estate Group and similar marks such as WiredRE, and WREG, and directing Asimos to cancel all of his registrations of the Wireless Real Estate Group mark and similar marks." The Tentative Decision found, further, that Asimos's continued use of the WREG trademark and

9

business identity constituted unfair competition under both California law and the Lanham Act, but awarded only token damages. And it concluded "Thompson is to recover his costs of suit, including attorney fees to be determined on noticed motion. [¶] Asimos is to take nothing on his cross-complaint . . . ."

      2.     *Statement of Decision, Judgment and Permanent Injunction*

Only Thompson made a formal request under section 632 of the Code of Civil Procedure[1] for a statement of decision. That request specifies a single issue for determination in the statement of decision: "How should the funds being held in trust for the parties by Mr. Gutierrez's law firm, the attorneys who prosecuted the lawsuit against Astound Broadband LLC for the parties, be distributed forthwith (after deduction of any fees and costs to which Mr. Gutierrez's firm is entitled)?"[2] In response to this request, the trial court filed its Proposed Statement of Decision on May 30, 2013. The only substantive revision to its earlier Tentative Decision was the addition of the following language:

"The parties have asked the court to issue a statement of decision which includes directions for distribution of the $155,000 which Mr. Gutierrez holds. In an effort to satisfy the parties' request, the court reasons as follows[:] If the Astound transaction had gone smoothly, distribution of the proceeds would have been governed by the parties' second contract, calling for 85% ($311,100) to Thompson. Asimos' breach caused the transaction not to go smoothly. As part of an effort to put Thompson in the situation he

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise designated.

[2] At oral argument in this court, Asimos's counsel, Jessica Barsotti, conceded that she did not file a section 632 request on her client's behalf, but stated that at the close of the trial evidence she made an oral, on-the-record request for a statement of decision addressing the claims alleged in the complaint and the cross-complaint, without specifying any particular issue. Even if such a generalized request was made—we have not located one in the trial transcript—it would not have complied with section 632, which requires that the requesting party "shall specify those controverted issues as to which the party is requesting a statement of decision."

10

would be in were it not for Asimos' breach, Mr. Gutierrez should distribute the Astound funds which he holds entirely to Thompson, after deduction for any fees and expenses to which Mr. Gutierrez and his law firm are entitled." The court also revised its disposition paragraph, ordering that Thompson's damages award, "when combined with funds to be distributed from Mr. Gutierrez's account, total $311,100, plus $250 token damages for service mark infringement."[3] There was no explanation for the reduction in damages by $5,005 from $316,105.

The court entered judgment on August 23, 2013, awarding Thompson $311,100 in damages from commissions he was owed on the Astound deal, $250 for trademark infringement, and $138,688 in prejudgment interest, plus costs of suit and attorney fees. Fees were awarded later, on motion, in an amount of $181,250. All totaled, Thompson came away with an aggregate monetary award of $631,288. In addition to monetary relief, the court issued a separate permanent injunction the same day prohibiting Asimos from using the service mark WREG and requiring him to cancel all of his registrations of the WREG mark and any similar marks. Asimos recovered nothing on his cross-complaint. This timely appeal from the judgment followed.

3.      *Thompson's Motions for Dismissal of this Appeal*

During the pendency of the appeal, Thompson has repeatedly charged Asimos with contempt in connection with the funds held in the Carr McClellan trust account. In the permanent injunction, Asimos was ordered to "cooperate immediately" in the distribution to Thompson of the funds held in that account. The permanent injunction instructed Asimos to "sign immediately any documents reasonably necessary to effectuate the distribution of the Astound settlement funds to plaintiff Jason Everett Thompson." On October 23, 2013, when Asimos filed his notice of appeal, he had not

---

[3] Since the court entered judgment without changing its May 30, 2013 Proposed Statement of Decision, we refer to the Proposed Statement of Decision below, throughout the opinion, simply as the "Statement of Decision."

yet signed a stipulation releasing the Astound funds to Thompson, as required by the permanent injunction.

On Thompson's motion, in November 2013 the trial court issued an order to show cause re contempt (OSC) requiring Asimos to show why a judgment of contempt should not be entered against him. At the hearing, the court found that Asimos was not in contempt, but ordered him again to sign the necessary documents to authorize release of the Astound funds. Following the hearing, Asimos signed the stipulation authorizing release of the funds, but added a written addendum saying he was signing "under protest" and that his signature did not authorize a "transfer of assets."[4] Because of the addition of this language to the authorization, Carr McClellan stated that it could not transfer the funds.

On November 19, 2013, Thompson filed a motion to dismiss the appeal based on the appellate disentitlement doctrine, citing Asimos's failure to comply with the trial court's injunction. This court denied that motion in January 2014, concluding that " 'where a doubt exists' " as to whether an appellant's conduct is contumacious, an appellate court " 'will tolerate temporarily' " disruptive behavior.[5] When, by August 21, 2015, Asimos still had not signed an unqualified authorization for Carr McClellan to release the Astound funds, Thompson filed a second motion for an OSC re contempt, which the trial court granted. In his opposition to this second motion instituting contempt

---

[4] Asimos took the position that because his bankruptcy proceedings were still pending, he was entitled to delay the distribution of funds to ensure that the bankruptcy trustee would not attempt to claim the Astound funds as an asset of the bankruptcy estate. The trustee wrapped up the bankruptcy proceedings, found that Asimos had no property available for distribution from the estate, and was discharged from all further duties as trustee, on May 19, 2014.

[5] Quoting *Tobin v. Casaus* (1954) 128 Cal.App.2d 588, 592.

12

proceedings, Asimos argued his appeal of the injunction stayed enforcement of the injunction.[6]

In reply, Thompson argued the injunction was not stayed because (1) Asimos appealed only the judgment, not the permanent injunction, and (2) Asimos had not perfected a stay of the injunction by depositing the signed authorization with the court as required by section 917.3. Subsequently, on October 21, 2015, Asimos filed in the trial court a "Notice of Lodging of Executed Document Pursuant to [Code of Civil Procedure section 917.3]" (Notice of Lodging). Attached to the Notice of Lodging was a copy of the authorization, signed by Asimos and dated October 19, 2015.

The trial court later concluded Asimos did not perfect a stay of the injunction. The mini-minutes of a trial court hearing held on November 2, 2015 state "the Court found that [Asimos] did not lodge the original signed authorization for disbursement of funds with the Court." The court granted the requested OSC and set a further hearing for November 13, 2015. When Asimos and his counsel failed to appear that day, the court issued a $50,000 bench warrant for his arrest. The court's written contempt order filed that date states its findings that it has maintained jurisdiction over Asimos "in regard to" the permanent injunction, and that "performance of [Asimos's] obligations under the Permanent Injunction were not stayed by virtue of the appeal undertaken by [Asimos]."

Without explaining why it found Asimos's lodging of a copy of a signed authorization to have been inadequate, the court adjudged Asimos guilty of contempt for his failure to comply with the permanent injunction issued over two years earlier. The court further held, "[d]efendant's disobedience has been willful and with the intent to frustrate the processes of this court and to deprive Plaintiffs of the benefits to which they

---

[6] Asimos submitted a declaration stating Barsotti advised him that the filing of the appeal stayed the injunction. Asimos also said he believed he could not authorize a transfer of assets because of his pending bankruptcy proceedings, and he submitted to the trial court a declaration from his bankruptcy attorney stating that Asimos could not voluntarily transfer assets, and that Asimos was aware of that restriction.

13

are entitled under the Permanent Injunction." Finally, the trial court again ordered Asimos to execute the necessary documents authorizing release of the Astound funds.

Another hearing was scheduled for November 20. At the November 20 hearing, the trial court found Asimos had once more failed to sign and deliver a document authorizing release of the Astound funds. The court then issued an order to Carr McClellan directly instructing them to bypass Asimos's authorization, and the funds were paid out to Thompson. In light of these events relating to the judgment of contempt, Thompson filed a second motion in this court to dismiss Asimos's appeal based on the disentitlement doctrine. This court issued an order deferring the motion for consideration along with the merits of the appeal.

## II.    DISCUSSION

### A.    Thompson's Second Motion to Dismiss

Appellate disentitlement is a "well-established" doctrine that bars a party to an action from appealing a judgment when that party has engaged in " 'willful disobedience or obstructive tactics' " to frustrate the enforcement of the judgment he seeks to appeal. (*Stoltenberg v. Ampton Investments, Inc.* (2013) 215 Cal.App.4th 1225, 1230, 1234, italics omitted (*Stoltenberg*).) Even where the appellant raises allegations of "serious misconduct by the original judge," the disentitlement doctrine applies where a party "seeks to undercut . . . proceedings against himself or herself without subjecting himself or herself" to a lower court's judgment, thus creating a "fundamental enforceability problem" for courts. (*Polanski v. Superior Court* (2009) 180 Cal.App.4th 507, 537, 538 (*Polanski*).)

The doctrine has been described as a "discretionary tool that may be applied when the balance of the equitable concerns make it a proper sanction . . . ." (*People v. Puluc-Sique* (2010) 182 Cal.App.4th 894, 897.) Its purpose, described variously over the years as ensuring the enforceability of decisions rendered on or following an appeal, imposing a penalty on an appellant for "flouting the judicial process," discouraging fugitives from justice, and "promoting the efficient operation of the courts" (*id.* at pp. 897–898), boils down to this enduring statement more than 75 years ago: "A party to an action cannot,

14

with right or reason, ask the aid and assistance of a court in hearing his demands while he stands in an attitude of contempt to legal orders and processes of the courts of this state." (*MacPherson v. MacPherson* (1939) 13 Cal.2d 271, 277 (*MacPherson*).)

Thompson's latest motion to dismiss under the disentitlement doctrine has substantial merit, but ultimately we must deny it. We do not discount or in any way condone the evasions Asimos engaged in here. He was adjudged guilty of contempt by the trial court after he repeatedly failed to comply with the injunction. (See *MacPherson*, *supra*, 13 Cal.2d at p. 276; *Stoltenberg*, *supra*, 215 Cal.App.4th at p. 1227.) He failed to "sign immediately any documents reasonably necessary" to distribute the Astound funds to Thompson. When he eventually signed the approval form, he signed it "under protest," offering the reservation that his signature did not constitute a "transfer of assets." And ultimately, because of his equivocations, and apparently those of his counsel as well, Carr McClellan could not release the funds.

This was part of a clear pattern. The court several times ordered Asimos to sign the necessary documents, and the record reveals he evaded compliance with the judgment for more than two years between August 2013, when the permanent injunction was issued, and November 13, 2015, when he was held in contempt. Even after an order to show cause re contempt (OSC) issued on November 2, 2015, and at the hearing on the motion seeking the OSC when the court questioned the adequacy of Asimos's signed authorization for release of funds, he and his counsel elected not to appear at the November 13 hearing on the OSC, resulting in issuance of a bench warrant. In its contempt judgment, the trial court found that Asimos's lack of cooperation was "willful" and was carried out "with the intent to frustrate the processes of this court and to deprive Plaintiffs of the benefits to which they are entitled."

Nevertheless, having carefully weighed whether Asimos should suffer the ultimate appellate sanction—dismissal for misconduct, thereby stripping him of his appellate rights—we conclude that, while the question is close, the equities do not require it. There is some reason to doubt whether he was properly found guilty of contempt. While the contempt proceedings were pending, Asimos, having perfected an appeal, lodged a

15

signed authorization for release of the Astound funds, thus, it seems, triggering a stay of the permanent injunction, and arguably depriving the trial court of jurisdiction to proceed further with contempt proceedings while the appeal was pending.[7] Thompson argues that Asimos's notice of appeal of the judgment does not encompass the permanent injunction, but we disagree. A reversal of the judgment on any number of the grounds now urged by Asimos in this appeal would have required a reversal of the injunction.

The critical issue here is whether Asimos deposited the instrument he was directed to sign, as executed, with the "clerk of the court where the original judgment or order is entered" in compliance with section 917.3. For reasons we cannot discern from the record, the trial court refused to accept the lodged document Asimos filed in an effort to comply with the statute. His counsel, Barsotti, first attempted to file the document on October 21, 2015. The wording of the authorization for release of funds she filed on October 21 was unqualified, although she did state grudgingly in the accompanying Notice of Lodging, for whatever it was worth—which was nothing, for it was not up to her to decide—that "this document may not be used to attempt to execute any portion of the judgment in this matter until such time that the Court of Appeal renders a decision in favor of [Thompson], if ever."

According to the minutes of the unreported hearing on Thompson's motion for issuance of an OSC on November 2, 2015, the court declined to accept the document Barsotti filed on October 21 not because of her purported limitation on it, but because it was only a copy. There is no indication that an original was later presented, but according to the minutes of the unreported proceedings on the OSC on November 13, when the status of the signed authorization came up again, in the absence of Barsotti and

---

[7] See section 917.3 ("The perfecting of an appeal shall not stay enforcement of the judgment or order in the trial court if the judgment or order appealed from directs the execution of one or more instruments *unless the instrument or instruments are executed and deposited in the office of the clerk of the court where the original judgment or order is entered to abide the order of the reviewing court*.") (italics added).

Asimos, Thompson's counsel stated that, on November 9, 2013 he had received the authorization but that it was "signed but NOT dated."

From all of this, we may surmise why the court rejected Asimos's signed authorization—perhaps it was dissatisfied because the document was not an original, perhaps it had a problem with the appearance of equivocation created by Barsotti's Notice of Lodging, or perhaps the fatal defect was the fact the document was undated— but the significance of any of that to the applicability of the proviso in section 917.3 is not obvious. In the context of contempt proceedings, more clarity in the record was required. The trial court made a finding that a valid order had issued, but we are unable to find substantial evidence in the record showing that, as of the date of the contempt hearing, the order remained enforceable.

Here, unlike most other procedural settings, we cannot imply findings the trial court did not make. An "appellate court does not presume [a contempt] order to be correct. Rather, because of the summary nature of civil contempt, all presumptions are drawn against the validity of the contempt order." (*In re D.W.* (2004) 123 Cal.App.4th 491, 501; accord, *In re M.R.* (2013) 220 Cal.App.4th 49, 58.) Although the disentitlement doctrine does not necessarily require a formal finding of contempt, on this record the court's contempt finding is sufficiently central to the requested relief that, in exercising our discretion, we must err on the side of proceeding to the merits.[8]

---

[8] We do not reach, and we express no view on, the question of whether the contempt judgment was properly entered. That judgment is final. Asimos did not seek review of it by writ of prohibition (see *Koehler v. Superior Court* (2010) 181 Cal.App.4th 1153, 1165), and we are not required to pass on its validity here, nor could we, since contempt judgments are not appealable. (*In re Buckley* (1973) 10 Cal.3d 237, 258–259.) All we decide is that there is enough doubt about the trial court's jurisdiction to proceed with an adjudication of contempt after October 21, 2015 for us to withhold the equitable remedy of appellate disentitlement.

### B. The Trial Court's Statement of Decision and Judgment

#### 1. *Standard of Review*

In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo. (*Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 765.) We apply a substantial evidence standard of review to the trial court's findings of fact. (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 364 (*Foreman*).) Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings. (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613 (*Gevorgian*).)

A single witness's testimony may constitute substantial evidence to support a finding. (*Gevorgian, supra,* 218 Cal.App.4th at p. 613.) It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility. (*Foreman*, *supra*, 144 Cal.App.4th at p. 365.) "A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 (*Arceneaux*).) Specifically, "[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision." (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 48 (*Fladeboe*).)

When a proper request for a statement of decision has been made, the scope of appellate review may be affected. (See Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2016) ¶¶ 16:197 to 16:216.5, pp. 16-45 to 16-48.) Under section 632, upon a party's request after trial, the court must issue a statement of decision "explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial." And under section 634, if the statement of decision does not resolve a controverted issue or is ambiguous, and the omission or ambiguity was brought to the attention of the trial court, "it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue." (See

18

*Culbertson v. Cizek* (1964) 225 Cal.App.2d 451, 465–466; see also *Arceneaux*, *supra*, 51 Cal.3d at pp. 1133–1134.)

The statutory statement of decision process following " 'the trial of a question of fact by the court' . . . [¶] . . . is for the benefit of the court and the parties.  To the court it gives an opportunity to place upon [the] record, in definite written form, its view of the facts and the law of the case, and to make the case easily reviewable on appeal by exhibiting the exact grounds upon which judgment rests.  To the parties, it furnishes the means, in many instances, of having their cause reviewed without great expense.' " (*Whittington v. McKinney* (1991) 234 Cal.App.3d 123, 126–127, italics and citations omitted.)  A proper statement of decision is thus essential to effective appellate review. "Without a statement of decision, the judgment is effectively insulated from review by the substantial evidence rule," as we would have no means of ascertaining the trial court's reasoning or determining whether its findings on disputed factual issues support the judgment as a matter of law.  (*Gordon v. Wolfe* (1986) 179 Cal.App.3d 162, 168.)

Together, sections 632 and 634, as implemented by rule 3.1590(d)–(g) of the California Rules of Court, establish a two-step procedure for requesting a statement of decision and preserving objections for pursuit on appeal.  First, following the court's announcement of its tentative decision, section 632 requires a party to specify, in timely fashion and in proper form, "those controverted issues as to which the party is requesting a statement of decision.  After a party has requested the statement, any party may make proposals as to the content of the statement of decision."[9]  This initial step serves the function of advising the trial court of exactly what issues the parties view as  materially controverted at the close of the evidence, just as the process of settling jury instructions

---

[9] In cases tried over the course of more than one day or more than eight hours, this must be done in writing (unless the parties appearing at trial agree otherwise) within 10 days of the court's announcement of its tentative decision.  In cases tried in a day or less or in less than eight hours, it may be done orally at any time before submission of the matter for decision.  (§ 632.)

19

serves to frame issues for decision by the fact-finder in the jury trial setting.[10]  Second, section 634 requires that any omissions or ambiguities in the statement of decision must be "brought to the attention of the trial court either prior to entry of judgment or in conjunction with" a new trial motion (§ 657) or a motion to vacate the judgment (§ 663), thus allowing the court to respond to objections before the taking of an appeal.  The second step is not a substitute for the first.  Objections are germane only as to issues framed as materially controverted under section 632.

For the doctrine of implied findings to be disabled on appeal, both steps of the two-step procedure under section 632 and 634 must be followed.  (*Fladeboe, supra,* 150 Cal.App.4th at pp. 58–59.)  Where a party fails to "specify . . . controverted issues" or otherwise "make proposals as to the content" of a statement of decision under section 632 (forcing the trial court to guess at what issues remain live during preparation of the statement of decision), or where a party complies with section 632 but fails to object under section 634 (depriving the trial court of the opportunity to clarify or supplement its statement of decision before losing jurisdiction), objections to the adequacy of a statement of decision may be deemed waived on appeal.  (*Id.* at p. 59.)  Because either procedural defect impedes the trial court's ability to fulfill its duty under section 632 and potentially undermines the effectiveness of any statement of decision it prepares as a tool of appellate review, strict adherence to both steps of the process is necessary before we will reverse the presumption of correctness generally accorded trial court judgments on appeal.

Even where proper procedure under sections 632 and 634 has been followed punctiliously, "[t]he trial court is not required to respond point by point to the issues

---

[10] California Rules of Court, rule 3.1590(c) provides a number of options to the trial court in structuring and managing this first step of the statement of decision process, including placing the onus on one of the parties to prepare a proposed statement of decision or directing that its tentative decision serve as the proposed statement of decision.  Since the trial court in this case did not avail itself of any of these options, rule 3.1590(c) is not relevant to our analysis here.

posed in a request for statement of decision. The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case." (*Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1379–1380; accord, *Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 500.) "When this rule is applied, the term 'ultimate fact' generally refers to a core fact, such as an essential element of a claim." (*Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 513.) "Ultimate facts are distinguished from evidentiary facts and from legal conclusions." (*Ibid.*) Thus, a court is not expected to make findings with regard to "detailed evidentiary facts or to make minute findings as to individual items of evidence." (*Nunes Turfgrass, Inc. v. Vaughan–Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518, 1525 (*Nunes Turfgrass*).) In addition, "[e]ven though a court fails to make a finding on a particular matter, if the judgment is otherwise supported, the omission is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings." (*Ibid.;* accord, *Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 67–68.)

2.    *Asimos's Cross-Complaint*

The portion of the trial court's Statement of Decision resolving Asimos's cross-complaint against him reads, in its entirety, as follows: "Asimos asserts five theories of relief in his cross-complaint . . . .  (1) Breach of contract.  Asimos complains that Thompson secretly carried out transactions in which Asimos should have been included. The court has been presented with no credible evidence of such secret transactions. (2) Breach of covenant of good faith and fair dealing.  Absent pleading and proof of a special relationship between the parties, this theory of relief duplicates the breach of contract theory of relief.  No such special relationship exists in the present case.  (3), (4), and (5). Accounting, Fraud and Concealment, and Constructive Trust.  To have viability, these theories of relief, like the first two, require some credible evidence of concealment, and the court finds no such credible evidence."

Asimos argues that, in rejecting the claims asserted in his cross-complaint, the trial court "utterly failed in its fact finding duties."  In support of this argument, he takes the position that Thompson admitted breaching the ICAs in at least 10 different ways, none of which the court expressly addressed.[11]  For each of these "admitted" breaches, Asimos claims he asked for a specific finding of fact when he filed a list of 41 objections on June

---

[11] According to Asimos, Thompson breached the ICAs by (1) failing to provide all documents that may have a material effect on the parties' performance; (2) refusing to "run all business of WREG through Asimos"; (3) "paying commissions to the broker in violation of" the ICAs as well as "established law"; (4) "failing to pay all of the commissions owed"; (5) "failing to hire Asimos as an independent contractor at termination"; (6) "maintaining contacts and leads after termination of the agreement for his sole use and benefit"; (7) "hiring agents and employees of WREG while under contract with Asimos to do [the] work of a real estate licensee"; (8) "collecting commissions on his own as a salesperson" in violation of the ICAs and of applicable law; (9)  "working with other out of state brokers while associated with Asimos as his broker"; and (10) "conduct[ing] his business WREG separate and apart from Asimos and collect[ing] monies therefore (sic) during the contract period."  For each of these alleged breaches, Asimos cites specific covenants in the ICAs that he contends the court never considered.

13, 2013 in response to the court's Statement of Decision, and he says he raised the same objections in a motion for a new trial. The trial court denied his new trial motion on procedural grounds (untimely notice, late filing of his brief), and never responded to his objections or clarified or supplemented the Statement of Decision.

Anticipating that he may have problems with this argument because of the presumption in favor of the judgment on appeal, Asimos contends he "performed all of the required steps to avoid [an] inference in favor of the judgment, including bringing deficiencies in the statement of decision before the trial court by way of objections and [post-trial] motions . . . ." We disagree. Asimos filed a laundry list of objections under section 634, but that was not enough to avoid the doctrine of implied findings. Because he filed nothing under section 632 specifying as "controverted" or otherwise proposing as "content" any of the manifold breaches of contract he now claims were never addressed,[12] we imply findings against him on each alleged breach, and we find substantial evidence in the record for those findings.

With respect to Asimos's non-contract claims, the trial court was correct that the breach of the covenant of fair dealing claim fails as a matter of law for lack of any showing of a special relationship. (See *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1399.) Asimos does not dispute that. The three remaining claims, for fraud, for an accounting and for imposition of a constructive trust, were expressly resolved against him for lack of "credible evidence of concealment." There is nothing ambiguous or incomplete about the court's finding on this ultimate issue, and we must defer to its credibility assessment. Based on our review of the record,

---

[12] The only section 632 request that was made here, from Thompson, specifies the appropriate distribution of the funds in the Carr McClellan trust account as the sole issue for written determination in a statement of decision. Under section 632, either party was entitled to object or ask for clarification if the court addressed this issue inadequately, but Asimos's list of 41 objections went well beyond the scope of the narrow section 632 request specifying the trust distribution issue for written decision.

we have no doubt the trial court considered Asimos's concealment arguments in all relevant particulars.

At trial, Thompson and Asimos took diametrically opposed positions as to how much information Thompson provided Asimos, and how much information Asimos was entitled to receive. The trial court plainly resolved that credibility battle against Asimos. As one indicator of this, the court opened its Statement of Decision by framing the facts in a way that, quite clearly, embraces the view that only some of Thompson's consulting activities are subject to DRE regulation, which necessarily means it rejected Asimos's theory that all of WREG's business was to be run through him. Beyond that, the court was not required to make findings on "detailed evidentiary facts or to make minute findings as to individual items of evidence." (*Nunes Turfgrass, supra,* 200 Cal.App.3d at p. 1525.)

        3.     *Thompson's Complaint*

        a.     <u>Breach of Contract Liability</u>

With respect to breach of contract by Asimos, the trial court's Statement of Decision makes the following findings: "Both [ICAs] contain a recital that Asimos is 'licensed as a real estate broker by the State of California.' Thompson contends that this recital implicitly constituted a promise by Asimos that Asimos would comply with the statutes and regulations which regulate the activities of licensed real estate brokers. The court agrees. [¶] Thompson complains of alleged breaches by Asimos. The breach resulting in measurable monetary harm is Asimos' failure to register Thompson's dba, [WREG], with the Department of Real Estate."

Asimos mounts two lines of attack on these findings. First, relying on the basic principle that "a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance" (*Consolidated World Investments, Inc. v. Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 380), Asimos repeats his contention that the findings are deficient for failure to address a number of alleged breaches of contract by Thompson. Because of these claimed omissions, Asimos contends the adverse determination against him on Thompson's breach of contract claim

24

must be reversed.  We reject this contention for the reasons explained above in Section II.B.2.  Asimos forfeited any objections to the adequacy of the Statement of Decision.

Second, Asimos argues that, under the plain language of the ICAs, he was not required to do anything more than maintain his status as a licensed real estate broker in good standing.  Thompson counters that, to the contrary, "after construing the contracts in the most reasonable manner, the findings of breach and damages caused by [Asimos] are supported by substantial evidence."  But other than the recital language in which Asimos represents he is a licensed broker, Thompson fails to identify any contract language supporting the court's legal conclusion that Asimos breached his obligations, much less its implied antecedent conclusion that Thompson complied with his own obligations (*see ante,* fn. 11), which leaves us with the task of reviewing an unarticulated interpretation of the disputed contracts.

Under California law, the steps a trial court must follow in determining the meaning of a written contract are well established, as are the applicable standards of appellate review.  (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165–1166 (*Winet*).)  The threshold question for trial and appellate courts is whether the writing is ambiguous—that is, reasonably susceptible to more than one interpretation.  (*Id.* at p. 1165; accord, *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351 (*Wolf*).)  Whether a contract is ambiguous at this initial step of analysis presents a question of law subject to independent review on appeal.  (*Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 754-755.)  In the trial court, and on appeal, contract interpretation always looks first to the words of the contract, but may also extend to parol evidence outside the four corners of the written agreement (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co*. (1968) 69 Cal.2d 33, 37), such as the parties' course of dealing over time (*Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 13).

In cases involving integrated contracts, the use of parol evidence is always subject to the limitation that parol evidence may not be used to vary or contradict the words the parties agreed upon, since an integrated writing must be taken as the best and final expression of their intent.  (§ 1856, subd. (a); Cal. U. Com. Code, § 2202.)  If there is no

25

ambiguity—that is, the language is reasonably susceptible to only one interpretation—our inquiry into meaning has been completed and the one reasonable interpretation applies to the facts. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; Civ. Code, § 1638.) If, on the other hand, ambiguity exists, the appellate standard of review turns on whether the trial court based its interpretation on the resolution of conflicts in the evidence. Our review is de novo where the evidence is undisputed (*Wolf*, *supra*, 114 Cal.App.4th at p. 1359, but where the trial court's interpretation rests on its resolution of conflicting evidence, "any reasonable construction will be upheld as long as it is supported by substantial evidence." (*Winet*, *supra*, 4 Cal.App.4th at p. 1166.)

With these principles in mind, we turn first to the operative wording in the ICAs. The two written contracts on which the independent contractor relationship between Thompson and Asimos was formed are both standard form agreements typically used to document the relationship between a real estate agent and a supervising broker, one signed June 4, 2008 ("2008 ICA"), and the other signed March 16, 2010 ("2010 ICA"). Although both contracts contain integration clauses, Thompson and Asimos operated for more than a year by "oral agreement" after the 2008 ICA expired while they negotiated renewal terms, a period during which no signed contract between them was in place. When the 2010 ICA was eventually finalized in March 2010, it included a number of specially negotiated amendments and an effective date backdated to January 1, 2009.

The parties to both ICAs are Asimos, who is defined as "Broker," and Thompson, who is defined as "Associate-Licensee." Paragraph 1 states that "Broker represents that [he] is duly licensed as a real estate broker by the State of California" in business as a sole proprietor under the dba "Drake Realty Services." Paragraph 2 states that Associate-Licensee . . . represents that he "is duly licensed by the State of California . . . as a real estate salesperson." The "transaction[s]"[13] covered are delineated in Paragraph 4,

---

[13] Section 16 defines the term "transaction" to mean "a sale, exchange, lease, or rental of real property, a business opportunity, or a manufactured home, which may be lawfully brokered by a real estate licensee."

26

"Licensed Activity," which provides in pertinent part "Associate-Licensee shall work diligently and with his . . . best efforts [to] (i) sell, exchange, lease or rent properties listed with Broker, . . . and (iii) otherwise promote the business of serving the public in real estate transactions" to the parties' mutual benefit, in compliance with applicable law. Paragraph 4 further provides that "Broker shall make [his office] available for Associate–Licensee's use, along with other licenses associated with Broker . . . ."

WREG is mentioned in Paragraph 8, addressing compensation[14] which "shall be charged to parties who enter into listing or other agreements for services requiring a real estate license." In the 2008 ICA, Paragraph 8, subparagraph (a), states in typed language filled in by the parties "20% COMMISSION SPLIT TO BROKER, DEAN ASIMOS FOR ALL WIRED REAL ESTATE GROUPS [*sic*] TRANSACTIONS. ALL COMMISSIONS AND REFFERALS TO EVERETT THOMPSON AND/OR WIRED REAL ESTATE GROUP TO BE PAID THROUGH DRAKE REALTY SERVICES. ALL OTHER R.E. TRANSACTIONS TO BE DEALT WITH ON I.C.B." Paragraph 8, subparagraph (b), states, also in typed language filled in by the parties, "80% OF GROSS COMMISSIONS ORIGINATED BY INDEPENDENT CONTRACTOR, EVERETT THOMPSON, FOR ALL WIRED REAL ESTATE GROUP TRANSACTIONS."

The 2010 ICA amended the language of the 2008 ICA in a number of respects. Most pertinent among these changes was the language concerning payable compensation and the term of the agreement. In amended Paragraph 8, the commission split changed from 80% for Thompson and 20% for Asimos, to 85% for Thompson and 15% for Asimos. The scope of commission-generating transactions was broadened so that commissions would be due on "ALL WIRED REAL ESTATE GROUPS [*sic*] TRANSACTIONS, INCLUDING MANAGED SERVICES, COLOCATION

---

[14] Section 16 defines the term "compensation" to mean "compensation for acts requiring a real estate license, regardless of whether calculated as a percentage of transaction price, flat fee, hourly rate, or in any other manner."

AGREEMENTS, LEASE/PURCHASE CONTRACTS.  ALL COMMISSIONS GENERATED BY E.THOMPSON & WIRED REAL ESTATE GROUP, TO BE PAID THROUGH DRAKE REALTY."  And under amended Paragraph 14, the parties agreed that "This contract will remain in effect until 09/30/2010 and can be terminated by either party, in writing . . . [on] 72 hour notice."[15]

Having reviewed the operative wording of the ICAs, we conclude that, contrary to Asimos's suggestion—his proposed interpretation of the ICAs would give him no affirmative contractual obligations of any kind, other than perhaps to pay his own license fees periodically—very little is clear from a plain language reading of these contracts.  On the specific issue of Asimos's contractual duties, we find the meaning of the ICAs to be ambiguous.  Another crucial ambiguity is what constitutes "Licensed Activity" under paragraph 4, an issue which is fundamental to the dispute here, because it impacts not only what Asimos claims are breaches by Thompson (see *ante,* fn. 11), but also the scope of Thompson's disclosure obligations (*ante,* p. 23).

Since we find ambiguity, we may look both to the contract language as well as undisputed parol evidence to determine the parties' contractual intent.  On this record, we have a mix of standard form contract language; custom language prepared by the parties, some typewritten and some in handwriting; a long period beginning January 1, 2009 in which the parties operated on an oral understanding, without any signed contract in place;

---

[15] Many of the negotiated changes in the 2010 ICA address the wind-down of the parties' collaboration following termination.  For example, a typed "Addendum" prepared by Thompson (the "Thompson Addendum") states that, upon termination, "Broker agrees to provide all reasonable assistance to Associate-Licensee in the termination or transfer of all right and title to the [WREG] sole-proprietorship, as registered in San Mateo, or terminate same, including governmental . . . business registration with the California Department of Real Estate."  Asimos contributed addendum language of his own in the form of a handwritten "Broker Agreement Addendum" addressing various items in a numbered list of points (the "Asimos Addendum").  Two of the items listed in the Asimos Addendum appear to confirm both parties' expectation Thompson would soon become a licensed broker himself, consistent with the focus in other amendments on the wind-down period following termination.

28

and a set of agreed written modifications, changing certain terms of the parties' contractual relationship mid-stream, retroactive to January 1, 2009. Reading the ICAs with this evidence in mind, we conclude that the trial court's interpretation in Thompson's favor—not expressed, but which we imply—is a reasonable one, supported by substantial evidence.

The only clear indication of how trial court interpreted the ICAs is its observation that, given the recitals in which Asimos represented himself to be a licensed real estate broker, it may be implied that he contractually committed to "comply with the statutes and regulations which regulate the activities of licensed real estate brokers." We agree, but conclude there is more than that. The parties' course of dealing accords with the interpretation of "Licensed Activity" proffered by Thompson, with money flows from commissions earned (modest as they were) being handled according to whether the deal involved was licensed or not. And by his conduct, Asimos confirmed he understood he was obligated specifically to register WREG with DRE. Upon signing the 2008 ICA in June 2008, he immediately took steps to carry out the registration; and he did so again when it came to his attention that WREG was not registered with DRE in 2009. He also admitted breaching this obligation. Thus, we see no error in the trial court's breach of contract finding against Asimos.

b. Breach of Contract Damages

Even if he was properly found liable for breach of contract, Asimos argues there was insufficient evidence to support the award of damages. Primarily, he argues lack of causation, but he also claims the amount of damages awarded was excessive on various grounds. We reject Asimos's lack-of-causation argument, but largely agree with his claims of error in the amount of the award.

To find support for the court's determination that Asimos's breach caused Thompson monetary harm, here again we need look no further than Asimos's conduct. By agreeing to become the plaintiff in the Astound lawsuit, Asimos confirmed his understanding—prior to the time the disputes here broke out, and during the time the parties were still committed to their course of dealing under the ICAs—that WREG's

29

DRE licensing status bore directly on the collectability of the Astound commission.  As the trial court put it, "Asimos' breach caused the transaction not to go smoothly."  By serving as plaintiff in the case against Astound, Asimos sought to eliminate Astound's defense of "no license," thereby rectifying the problem he caused.  Citing *Schantz v. Ellsworth* (1971) 19 Cal.App.3d 289, 293, Asimos now insists that, as a matter of law, an irregularity in WREG's DRE registration status could not justify Astound's refusal to pay a commission.  But perhaps he should have pressed this point in the Astound litigation.  By agreeing to settle for $155,000, he acknowledged that, due to the presence of the issue in the case, the legal uncertainty he brought about reduced the value of WREG's claim.

We cannot agree, however, with the trial court's further conclusion that Asimos's breach caused Thompson to suffer a loss of $311,100, the entire amount of the commission claimed from Astound, net of attorney fees and costs.  Just as we cannot accept Asimos's claim that the defense of "no license" was a sure loser, we cannot accept as a sure winner Thompson's claim of entitlement to $311,100.  " 'Damage to be subject to a proper award must be such as follows the act complained of *as a legal certainty.*' [Citations.]"  (*Filbin v. Fitzgerald* (2012) 211 Cal.App.4th 154, 165 (*Filbin*), quoting *Agnew v. Parks* (1959) 172 Cal.App.2d 756, 768, italics added by *Filbin* court.) "Conversely, ' " '[t]he mere probability that a certain event would have happened, upon which a claim for damages is predicated, will not support the claim or furnish the foundation of an action for such damages.' " ' " (*Filbin*, *supra,* at p. 166, quoting *Marshak v. Ballesteros* (1999) 72 Cal.App.4th 1514, 1518; see *Thompson v. Halvonik* (1995) 36 Cal.App.4th 657, 663 [damages claimed by personal injury plaintiff who accepted settlement and then sued her attorney for failing to prosecute her case more diligently rejected as speculative because she could not "demonstrate that but for [attorney's] delay, appellant's underlying case would have settled at all, let alone at an earlier date, for the same amount, or with the same structure"].)

The trial court appears to have applied a "but for test" of causation and beyond that accepted at face value Thompson's claim to a commission of $366,000, without scrutinizing the claim for likelihood of recovery.  Awarding Thompson his entire claimed

commission in the form of breach of contract damages after he settled the claim for far less assumes that, had the case been tried, he would have won every penny. There are too many vagaries in the litigation process to make that assumption. Thompson's own lawyer, Gutierrez, acknowledged as much in his testimony. On this record, we conclude that the only breach of contract damages Thompson proved to the requisite level of certainty amounted to 85 percent of the net settlement proceeds received from Astound (which appears to be $87,474,35, or 85 percent of the $102,911 remaining in the Carr McClellan trust account after deduction of fees and costs).

In addition to his categorical attack on the damages as legally unsustainable for lack of causation, Asimos pursues three lines of attack on the amount of the damages.

First, Asimos argues that the court erred in awarding prejudgment interest on Thompson's breach of contract damages award at 10 percent running from December 31, 2008. We see no error in the decision to award prejudgment interest, but we will vacate the amount awarded here as excessive. Civil Code section 3287, subdivision (a) provides that "[e]very person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day." " 'Under this provision, prejudgment interest is allowable' "—as of right—" 'where the amount due plaintiff is fixed by the terms of a contract, or is readily ascertainable by reference to well-established market values. [Citations.] On the other hand, interest is not allowable where the amount of the damages depends upon a judicial determination based on conflicting evidence . . . .' " (*Great Western Drywall, Inc. v. Roel Construction Co., Inc.* (2008) 166 Cal.App.4th 761, 767.) Under this provision, the trial court has no discretion—it must award prejudgment interest from the first day there exists both a breach and a liquidated claim. (*North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 828 (*Rogers*).)

"From the defendant's perspective, the certainty requirement promotes equity because liability for prejudgment interest occurs only when the defendant knows or can calculate the amount owed and does not pay." (*Watson Bowman Acme Corp. v. RGW*

31

*Construction, Inc.* (2016) 2 Cal.App.5th 279, 293 (*Watson*).)[16]  Under the applicable test

for certainty, "a dispute or denial of *liability* does not make the *amount of damages*

uncertain.  [Citation.]  As stated by our Supreme Court:  'Generally, the certainty

required of Civil Code section 3287, subdivision (a), is absent when the amounts due turn

on disputed facts, but not when the dispute is confined to the rules governing liability.'

(*Olson v. Cory* (1983) 35 Cal.3d 390, 402)."  (*Watson*, *supra*, at p. 294, some italics

omitted; see *Leff v. Gunter* (1983) 33 Cal.3d 508, 520 [elements of plaintiff's damages

calculations undisputed and recovery closely approximated plaintiff's claims].)

We imply a finding by the trial court that damages were readily ascertainable,

though not in the full amount the court awarded.  The dispute over whether WREG was

entitled to recover its commission from Astound revolved around liability, not the

amount of damages owed.  And Thompson testified without contradiction to the formula

under which WREG claimed a commission of $366,000 from Astound, of which it

eventually recovered $155,000 by way of settlement.  Although the trial court properly

accepted Thompson's formula as sufficient for the calculation of readily ascertainable

damages, it erred in applying that formula to the entire $366,000, since the prospect of

recovering the entire amount was speculative, as we explain above.  With respect to

prejudgment interest, the court also erred in selecting December 31, 2008 as the date to

begin accruing prejudgment interest.  That date is nowhere supported by the record.[17]  As

Asimos points out—and Thompson conceded at oral argument—the date of the Astound

settlement is the first date Asimos can be charged with knowing or being capable of

---

[16] As a conceptual matter, prejudgment interest is an element of damages, not a
cost of litigation, because it compensates the plaintiff for the loss of the use of property or
money during the period before the judgment is entered.  (*Rogers*, *supra*, 65 Cal.App.4th
at pp. 828, 830; see *Chesapeake Industries, Inc. v. Togova Enterprises, Inc.* (1983) 149
Cal.App.3d 901, 906.)

[17] One of the main difficulties in applying Civil Code section 3287, subdivision
(a), is in determining *when* a sum owed on a contract becomes liquidated (i.e., readily
ascertainable).  (*Moreno v. Jessup Buena Vista Dairy* (1975) 50 Cal.App.3d 438, 448.)

calculating the prejudgment interest on a fixed amount.  We therefore conclude that, on remand, the prejudgment interest on Thompson's breach of contract damages—as reduced to 85 percent of the net amount of the Astound settlement—must be recalculated based on an accrual date fixed as of the date of the Astound settlement.

Second, Asimos claims the court miscalculated the damages by *adding* the amount in the Carr McClellan trust account to its award of $311,100 for the Astound commission. For this contention, he points to the way the trial court phrased its award to Thompson when it revised the disposition paragraph of the Statement of Decision from the language in its tentative decision.  The phrasing is, indeed, somewhat ambiguous.  The court states it is giving "[j]udgment for Thompson and against Asimos in *an amount* which, *when combined with* funds to be distributed from Mr. Gutierrez's account, *total* $311,100, plus $250 token damages for service mark infringement." (Italics added.)  By using the phrase "when combined with," we think the court's intent was to say that the $102,911 in the Carr McClellan trust account was to be credited against the $311,100, and thus that, when it announced judgment for Thompson in "an amount"—without stating a figure— that amount was $208,189.  This is academic now, of course, since we are reducing the damages award to 85 percent of the net proceeds received in the Astound settlement.  But on remand, we will direct it be made clear in the judgment that any distribution Thompson has received from the Carr McClellan trust account shall be credited toward the discharge of Asimos's judgment indebtedness.

Third, and finally, Asimos claims that contractually he is entitled to 15 percent of the net proceeds from the Astound settlement, since he was owed that amount under Paragraph 8 of the 2010 ICA.  He is correct as a matter of contract entitlement, but he is incorrect that failing to include that offset as a separately reflected item in the calculation of damages was reversible error.  Asimos's 15 percent share of the net Astound settlement amount (which appears to be $15,436.65, or 15 percent of $102,911) will be included in the total offset we have ordered for any distribution Thompson has received from the Carr McClellan account as a credit against Asimos's judgment indebtedness.

### c.　　Trademark Infringement

In its Statement of Decision, the trial court found that "Wired Real Estate Group is an unregistered service mark owned by Thompson which enjoys protection under the Lanham Act. [Citation.]  Asimos had Thompson's permission to represent to the public that he was associated with Wired Real Estate Group only so long as that representation was accurate, but not after Asimos and Thompson had become disassociated from each other.  In this case, Asimos has continued to represent himself as being associated with Wired Real Estate Group despite repeated requests that he stop.  This persistence constitutes unfair competition under both the Lanham Act and California law (Bus. & Prof. Code, § 17200), actionable if Asimos used Thompson's mark in a way that was likely to cause confusion.  In this case, Asimos' use of Thompson's mark did cause confusion.  Thompson received multiple inquiries asking what relationship Asimos had with Wired Real Estate Group."  To remedy these statutory violations, the court awarded only nominal damages of $250 but included in its permanent injunction a bar on Asimos's further use of Thompson's WREG service mark or any similar marks.

Asimos's first attack on these findings is that Thompson sued him "for violations of both § 32 of the Lanham Act (15 U.S.C. § 1114) and § 43(a) of the Lanham Act (15 U.S.C. § 1125(a))" and that, "inconceivably," the court "found that [he] violated Thompson's trademark . . . without specifying under which section."  He appears to misunderstand the statutory scheme.  Section 43(a) of the Lanham Act creates a cause of action for trademark infringement, and section 32 of that Act specifies the available remedies.  Next, he argues that "Thompson did not offer a single shred of evidence that Asimos has infringed in any way on any trademark, Thompson did not establish that he had any protectable interest in the purported mark, nor did Thompson plead that he had acquired secondary meaning as required by the Act."  Pointing to his list of objections to the court's Statement of Decision and to his new trial motion, Asimos again argues that "because the trial court failed to make required findings" on these issues, the court's Lanham Act award must be reversed.

We disagree. "Section 43(a) of the Lanham Act makes actionable the deceptive and misleading use in commerce of 'any word, term, name, symbol, or device' on any goods or in connection with any goods or services." (*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery* (9th Cir. 1998) 150 F.3d 1042, 1046; see 15 U.S.C. § 1125(a).) A Lanham Act claim can be based on a theory of "false association," i.e., that the defendants made "false representations concerning the origin, association, or endorsement of goods or services through the wrongful use of another's distinctive mark, name, trade dress, or other device . . . ." (*Waits v. Frito–Lay, Inc.* (9th Cir. 1992) 978 F.2d 1093, 1108, abrogated on other grounds by *Lexmark Int'l, Inc. v. Static Control Components, Inc.* (2014) 572 U.S. __, 134 S.Ct. 1377, 1385, 1391.) Thompson correctly points out that because the WREG service mark requires the consumer to use her imagination to understand the mark's significance, the mark is inherently distinctive because it is "suggestive." (*Rudolph Int'l, Inc. v. Realys, Inc.* (9th Cir. 2007) 482 F.3d 1195, 1198.) Thus, evidence of secondary meaning was not required. Here again, we imply the necessary findings against Asimos and reject his claims of deficient fact-finding. There is substantial evidence in the record not only for the findings we imply, but for the court's express finding of customer confusion.[18]

### III. CONCLUSION AND DISPOSITION

Thompson's motion to dismiss this appeal is denied. The award in favor of Thompson for breach of contract damages including prejudgment interest is vacated; the judgment and the permanent injunction are in all other respects affirmed; and the case is

---

[18] Asimos does not challenge the court's finding of unfair competition under section 17200 of the Business and Professions Code. That finding supplies an independent basis for the court's permanent injunction barring him from further use of the WREG mark and similar marks. (See *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 328; *Two Jinn, Inc. v. Government Payment Service, Inc.* (2015) 233 Cal.App.4th 1321, 1345.)

remanded for further proceedings consistent with this opinion to (1) recalculate damages, including the award of prejudgment interest, and (2) clarify the judgment to ensure that any distribution to Thompson from the Carr McClellan trust account shall be credited toward the discharge of Asimos's judgment indebtedness. The parties are to bear their own costs of appeal.

_____
Streeter, J.

We concur:

_____
Ruvolo, P.J.

_____
Reardon, J.

Thompson v. Asimos (A140096)


Trial Court:    City & County of San Francisco Superior Court

Trial Judge:    Hon. Wallace Douglass (Retired Judge of the San Francisco Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Counsel:

Law Offices of Jessica R. Barsotti, Jessica R. Barsotti for
        Defendant, Cross-complainant and Appellant.

Kyle Law Corporation, Stephan E. Kyle, Andrew H. Winetroub for
        Plaintiffs, Cross-defendants and Respondents.