Filed 4/19/21  Dillon v. Karr CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| CECIL W. DILLON et al., | C083853 |
| Plaintiffs and Respondents, | (Super. Ct. Nos. STK-CV-UBC-2015-0004811, 39-2015-00325635-CU-BC-STK) |
| v. | |
| WILLIAM G. KARR, | |
| Defendant and Appellant. | |

Plaintiffs Cecil W. Dillon and Kenneth Kirsten sued their former partner, defendant William G. Karr, for contribution to the repayment of a loan the three of them had entered into while in business together.  The trial court ruled for plaintiffs, ordering defendant to pay his one-third share with interest.

Defendant challenges that ruling on appeal.  He maintains that his obligation to contribute should have been excused because funds from the loan were not used as required and he was never provided an accounting.

We affirm the judgment.

1

## FACTS AND PROCEDURAL HISTORY

The two plaintiffs and defendant were business partners. In 1993, they formed a Limited Partnership (LP) to develop land in Lodi. And in 2001, they formed Flag City RV Resort, LLC, a Limited Liability Company (LLC) to develop and operate an RV park.

In 2006, the three opened a line of credit with the Bank of Agriculture and Commerce to provide working capital for the LLC. When the line of credit became due, the parties renewed it in a series of rollovers.

In 2008, the LLC filed for bankruptcy. The next year, the LLC ceased doing business, and the year after that the parties filed a certificate of cancellation. The LP also ceased business in 2010, and a certificate of cancellation was filed in 2011.

In 2012, the parties and the bank converted the line of credit to a note, which the parties agreed to pay off. Plaintiffs Kirsten and Dillon ultimately paid the note in full. Defendant paid nothing, though he sent several e-mails confirming his intent to pay his share of the loan once he was able.

In 2015, plaintiffs sued defendant, seeking his contribution to the payoff. In response, defendant filed a cross-complaint, asking for an accounting.

### Testimony at Trial

At trial, the three former partners testified, along with an accountant who prepared their tax returns.

Plaintiff Kirsten testified that he, defendant, and plaintiff Dillon were the general partners of the LP and LLC, and the three of them made the decisions. He also testified that until the instant case, defendant had never requested to inspect or copy any books or records, nor had he requested any kind of accounting.

Defendant had access to the business records, with the LLC agreement providing: "Upon reasonable request, each member shall have the right in ordinary business hours to

2

request or copy at the requesting member's expense the records of the company described." The agreement also provided: "The books and records shall be at all times maintained at the principal executive office of the company and shall be open to reasonable inspection and examination of the members . . . ."

On cross-examination, Kirsten was asked about the plaintiffs' response to a discovery request for admission, asking: "Admit the loan proceeds from Bank of Agriculture & Commerce, the note for which was executed in July 2011, was distributed, disbursed, and otherwise used for the exclusive benefit of Flag City RV Resort, LLC and its operation." Plaintiffs had responded, "Subject to objections . . . Denied." Asked if this meant the money was not distributed, Kirsten testified: "The loan in 2011 was not. It was the one in 2006 that was distributed." The 2006 line of credit, Kirsten explained, "was set up on a 12-month basis to provide startup working capital for the new Flag City RV Resort." Kirsten testified that that loan money went to the LLC, though he conceded he did not have records to show that. He also explained that for the original line of credit, the bank wouldn't lend to the LLC, so the money was lent to the plaintiffs and defendant as individuals, with each jointly responsible for it.

Kirsten also testified that in 2012 his computer's hard drive crashed, and a repair shop was unable to recover the data.

Plaintiff Dillon testified that as to the LP, profits and losses were divided three ways between plaintiffs and defendant, and from day one, interest on the line of credit was paid equally between them.

Dillon testified that the line of credit was converted to a promissory note in 2012, when the bank wanted the credit line repaid. Unable to pay the $180,000 owed, plaintiffs and defendant negotiated a plan with the bank to make balloon payments for three years, until the loan was paid off. All three signed the documents.

When the first payment was due, Kirsten and Dillon contacted defendant for his share. Defendant said he was broke and couldn't put any money in. He, however, wrote

Kirsten and Dillon an e-mail, dated February 21, 2012: "This email is my confirmation that it is my full intention to pay my one-third share of the [Bank of Agriculture and Commerce] credit line principal balance and interest at [the bank's] prevailing interest rate."

Dillon testified that prior to the lawsuit, defendant had never requested an accounting. He also testified that he told defendant that Kirsten's hard drive had crashed.

On cross-examination, Dillon was asked: "the initial loan, the initial money that was borrowed by the three of you, how do you know that that money went into the LLC?" Dillon testified: "I have no idea. I'm the engineer. I wasn't doing the finances. You're asking me where a check or two or funds went ten years ago. That wasn't my role in this partnership."

The accountant who prepared tax returns for plaintiffs and defendant, was asked if defendant had requested an accounting of the LLC or LP. He testified: "Nothing that would have been out of the usual. He may have requested and received one over the years. We worked on projections together and other things related to the entities, but, you know, just normal what he would have been entitled to as a general partner or a manager."

Asked, "if defendant had presented you with a formal request for an accounting, would you have provided one?," the accountant testified: "Well, he was entitled to one. He's a general partner and a manager just like the other two." He added: "I always thought the relationship was pretty open between the parties and if at any time any of the managers or general partners would ask for a copy of the tax return, I would have provided it. They're all entitled to it."

The accountant also testified that he never prevented defendant from inspecting the books or records, and he was not aware of any fraud by the parties.

At trial, defendant was asked if he considered himself "financially sophisticated." He answered, "I certainly understand the financial . . . side of the game, yes," adding that

he had been "extensively involved in the banking industry, and . . . was in various ventures with different companies in different capacities." He had also been chief executive officer of First Commercial Bank for around 10 years. And he had reviewed, overseen, or drafted more than a hundred funding agreements.

Defendant testified that he was never denied access to the books and records by the accountant. He had seen the LLC's tax returns from 2007 to 2009, the LLC's check registers and QuickBooks reports from 2001 through 2006, and the LLC's balance sheet for 2009. And to the best of his knowledge, he had never requested an accounting before he filed his cross-complaint.

Asked if he requested copies of disbursement of the payments from the bank or plaintiffs, he answered, "Not specifically." "At the time I had no knowledge of fraud. I was very close with the two plaintiffs and they were very good friends and I at the time had no reason to think that there was any misfunctions or whatever." He testified that he had always assumed the funds went into the LLC, but during discovery he became concerned about fraud, citing request for admission responses where plaintiffs denied proceeds went to the LLC.

Still, as to the 2012 note, defendant testified that he understood what he was signing, he had no concerns or issues with it, and voiced no concerns at the time. He explained, "It was a renewal of the original note that occurred in April of 2006." He agreed that no funds were distributed from the 2012 note, which was a carry forward from the original line of credit: "This was a renewal note after a series of renewals from the obligation that was established for the purpose of the LLC between the three of us as individuals in April of 2006."

Defendant also testified that he sent e-mails in 2012, 2013, and 2014 confirming his intent to pay his share of the loan when able. He added: "Assuming I should confirm that with accounting records and so forth." But he conceded he had nothing in writing to that effect.

5

Defendant was also asked about his involvement in the LLC's bankruptcy. He testified that he had prepared a declaration in support of a motion for reconsideration, where he wrote: "Due to my professional banking background, I have been in the lead role on behalf of Flag City in presenting the project to investors and to aid in this endeavor. I have developed and produced the investor presentation package that is attached hereto . . . ." The declaration attached a presentation package defendant had prepared for investors considering investing in the operation. It included figures for occupancy and sales, profit and loss trends, as well as monthly revenue sources.

Defendant also wrote in the declaration: "The Investor Presentation Package and supporting documents show that Flag City RV Resort has experienced strong growth during its first three years of operation. Monthly occupancy and revenues have increased in each and every month of operations when compared to prior year over periods."

Defendant was asked if he had "access to the books and records to produce this investor package?" He answered: "I have to go through it to be — to understand." Plaintiffs' counsel followed up, "Could you just tell me how you did this with no accounting of the LLC?" Defendant replied: "If you look at the occupancy report, that would be information provided by the people that ran the RV resort, the managers." Defendant clarified that plaintiffs Dillon and Kirsten were the managers of the RV resort. Asked how he prepared the portion in the report about monthly profit and loss trends, without an accounting, defendant testified, "I think your terms of 'accounting' are a little misguided. Bookkeeping entries would be a little different. Because I have looked at this income statement and expenses, clearly the — this is a recapitulation of the trend sheets to show an investor what the RV resort generated and what the expenses were during individual months during the time frame that's described in the index."

Defendant also testified that he first learned of Kirsten's computer crash through plaintiffs' discovery responses. He explained that that indicated fraud to him because it indicated plaintiffs' fiduciary responsibilities were not followed, and "it just seems very

6

strange that everything was lost. You know, backup, et cetera, et cetera. To me that is impossible."

## Closing Argument

In closing, defense counsel argued plaintiffs had engaged in constructive fraud by failing to provide defendant with an accounting: "The mere fact that a fiduciary fails to produce the books and records that they're required to keep and maintain means that there is constructive fraud, to say the least. . . . They have the burden of producing the information that would show that the money went where it was supposed to go and they cannot do that by their own doing."

Counsel also argued: "But it goes deeper than that because you have actual fraud because you have the concealment and you have the incidence of the suppression, deflection, and obfuscation that shows that that concealment was willful. So there is actual fraud here."

## The Trial Court's Ruling

Following closing arguments, the trial court provided an oral statement. In it, the court adopted the statement of facts in the plaintiffs' trial brief. The court went on to find that plaintiffs and defendant entered into a bank loan as individuals, with each sharing a third of the obligation. They also subsequently signed, in their individual capacity, a promissory note when they were dissolving the business entity. Plaintiffs paid the full amount of the note, with defendant repeatedly promising to make his share when he could.

Never before the lawsuit, the court found, did defendant request an accounting or record inspection. And he appeared to have had access to those items. Indeed, defendant prepared an investor proposal that included information regarding account balances, assets, liabilities, and corporate worth. The court also noted, "defendant is an

7

experienced financial expert," and "very likely would be qualified as an expert in financial area if he were to testify in this courtroom."

The court also found, "no credible evidence presented of fraud to justify [defendant's] cross-claim or defeat liability in this particular action."

The trial court ultimately awarded plaintiffs $78,816.64, in damages, interest, and costs, including $796.70 in costs as cross-defendant.

## DISCUSSION

On appeal, defendant is proceeding in pro per. Pro per litigants are required to follow the rules of appellate procedure; they are treated like any other party and receive no greater consideration. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1247.)

Defendant contends he should have been relieved of his obligation to contribute to the loan payoff. He argues plaintiffs defrauded him and cannot account for the use of the funds on which the loan obligation is based. He also argues plaintiffs owed him a fiduciary duty to provide an accounting — even absent a demand for one. This argument has no merit.

I

*Fraud and the Use of the Loan Proceeds*

Throughout his briefs, defendant echoes that the loan was to be used for the LLC. And he insists that the funds were not, in fact, used for that purpose. While not framed as such, defendant appears to be raising a substantial evidence challenge to the trial court's finding of no fraud, and the implicit finding that proceeds from the line of credit were put to a proper use.

On appeal of a judgment based upon a statement of decision, we review the trial court's findings of facts for substantial evidence. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) "Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light

8

most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Ibid*.) We resolve all conflicts in favor of the prevailing party and do not reweigh evidence. (*Yazdi v. Dental Board of California* (2020) 57 Cal.App.5th 25, 32.) " 'Thus, we do not determine whether substantial evidence would have supported a contrary judgment, but only whether substantial evidence supports the judgment actually made by the trial court.' " (*Ibid*.) Finally, " '[t]he testimony of one witness, even that of a party, may constitute substantial evidence.' " (*In re Marriage of Ankola* (2020) 53 Cal.App.5th 369, 380.)

Here, substantial evidence supports the trial court's finding. Plaintiff Kirsten testified that loan proceeds were used for the trailer park LLC. That Kirsten did not have records to show that, that his hard drive crashed, and that Dillon had "no idea" if the initial loan money went to the LLC, did not preclude the trial court from finding Kirsten's testimony credible. Indeed, for many years, defendant, who "certainly under[stood] the financial . . . side of the game," had access to the records, yet at trial, he presented no evidence of actual fraud.

Instead, the defense made much of discovery admissions that the 2011 loan was not used for the LLC. And on appeal, defendant similarly points to trial testimony that proceeds from a 2011 loan were not applied to the LLC. But as trial testimony established, the 2011 loan was a rollover of the existing loan — and thus did not result in proceeds. The 2006 line of credit, by contrast, did result in proceeds, with defendant himself testifying that subsequent notes were "essentially a carry forward from the original credit line."

In sum, trial testimony supported the finding of no fraud, and nothing defendant points to on appeal compels a contrary conclusion.

II

*Plaintiffs' Obligation to Provide an Accounting*

Defendant also argues plaintiffs owed him a fiduciary duty to provide an accounting — even if he did not request one — and their failure to do so constitutes constructive fraud. In support, he cites Corporations Code section 16403, subdivision (c)(1) (all statutory section references that follow are found in the Corporations Code unless otherwise stated) and *San Pedro Lumber Co. v. Reynolds* (1896) 111 Cal. 588 (*San Pedro Lumber*). Neither are availing.

Section 16403 pertains to the right of access to a partnership's books and records, and subdivision (c)(1) requires that each partner and the partnership shall furnish to a partner "[w]ithout demand, any information concerning the partnership's business and affairs reasonably required for the proper exercise of the partner's rights and duties under the partnership agreement or this chapter." But defendant made no showing that the exercise of his rights and duties as a partner required a full accounting — particularly given that he never requested one.

Further, we do not read section 16403 to require a partnership to provide an accounting absent a request for one. Section 16403 requires the partnership to "keep its books and records, if any, in writing or in any other form capable of being converted into clearly legible tangible form, at its chief executive office." (§ 16403, subd. (a).) It also requires the partnership to "provide partners and their agents and attorneys access to its books and records." (§ 16403 subd. (b).) By all indications, this was done. And we think that if the Legislature wished partnerships to take the additional step of providing full accountings without demand, it would have said so.

*San Pedro Lumber, supra*, 111 Cal. 588, is also unavailing. In that matter, the single cause of action set forth in the complaint was for the enforcement and foreclosure on a lien and an accounting was necessary to determine the amount for which the lien

could be enforced. The Supreme Court discussed the reach of equitable remedies and held that to state a claim for a cause of action that requires an accounting, one need only plead that a fiduciary relationship exists and that a duty rests upon the defendant to render an account. (*Id*. at pp. 595-596.) But here there is no contention that defendant's cross-complaint failed to state a claim, the issue at bar in *San Pedro Lumber*. Here, the sufficiency of the pleadings were not at issue and the trial court found defendant was obligated to contribute to the loan repayment; nothing excused that obligation. *San Pedro Lumber* is no help to defendant.

At the heart of the matter, the trial court found, and we agree, that defendant did not have a right to an accounting having never requested one.

Thus, because the evidence at trial supports the finding that defendant never requested an accounting and because defendant has failed to show plaintiffs were nevertheless obligated to provide one, the contention fails.

## DISPOSITION

The judgment is affirmed. Defendant shall pay plaintiffs' costs on appeal. (Cal. Rules of Court, rule 8.278.)

 

 

HULL, Acting P. J.

 

We concur:

 

 

ROBIE, J.

 

 

KRAUSE, J.

11