Filed 8/4/23  Corrigan v. Valentine CA1/4
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ERIK CORRIGAN et. al.,<br><br>    Plaintiffs and Respondents,<br>v.<br><br>KATHERINE VALENTINE,<br><br>    Defendant and Appellant. | A162925, A163339<br><br>(San Mateo County<br>Super. Ct. No. 18CIV04107) |

Defendant Katherine Valentine appeals a judgment granting plaintiffs Erik and Stephanie Corrigan easements to run utility lines across her property and a related permanent injunction requiring Valentine to permit the Corrigans to perform work necessary to maintain and repair the utility lines. She contends the judgment and injunction must be reversed because the court failed to make findings in its statement of decision necessary to support the creation of the implied utility easements. We agree and accordingly, we shall reverse the judgment and injunction and remand for further proceedings.

In addition, Valentine contends the court improperly imposed a duty on her, unrelated to the easements, to allow the Corrigans to access her property for the "purpose of repairing/updating or replacing . . . telephone and cable lines that may run under [her] property." Although the above-quoted

1

language is included in the court's statement of decision, no such duty is imposed in the judgment or injunction and any claim regarding access to possible telephone and cable lines are outside the scope of the easement claims made in the complaint. On remand, the trial court is directed not to include this language in any amended statement of decision that may be issued.

## Background

The parties own adjacent properties in the Town of Woodside, California (the town). In the late 1950s, the then-owners subdivided their single parcel into several lots, including the lots now owned by the parties.

A survey map dated October 1958, which the parties call the "Brian Survey," shows the subdivision of the property. In July 1959, the map was recorded in volume 4 of Licensed Land Surveyors Maps at page 54 (sometimes referred to as 4LLS54). The map shows the following easements, each crossing the property now owned by Valentine for the benefit of the property now owned by the Corrigans: an 18-foot easement for power and water; a 10-foot gas easement; and a 10-foot sewer easement.

Ownership of the lots changed hands several times between 1958 and 2014, when the Corrigans and Valentine purchased their properties. The 2014 deeds for the Corrigan and Valentine properties both reference the 1958 survey map. The Corrigans' deed describes their property as "Parcels A and C as shown on that certain record of survey being a resubdivision of lot 19 and portions of lots 1, 2, 3, and 18, block 2, [Woodside] Heights, San Mateo County, State of California on July 29, 1959 in Volume 4 of Licensed Land Surveyors Maps, at page 54." Valentine's deed includes a longer description of the property but includes the language, "Being Parcel 'E' as shown on the

record of survey recorded July 29, 1959 in Book 4 of Licensed Land Surveyor's Map at page 54."

Shortly after the parties' purchases, a dispute arose as to the utility easements. On August 8, 2018, the Corrigans filed the present action seeking recognition of the utility easements. Following a 12-day bench trial, the court issued a statement of decision and entered judgment in favor of the Corrigans. The court found that the 1958 survey map and related subdivision of the property created the implied utility easements. The court also issued a permanent injunction prohibiting Valentine from interfering with the operation of the easements.

## Discussion

### 1. The Utility Easements

#### a. The Applicable Law

"Easements may be created by grant or by prescription. [Citation.] The set of easements created by grant fall into two subsets: easements created by express grant, and easements created by implied grant." (*Mikels v. Rager* (1991) 232 Cal.App.3d 334, 355–356 (*Mikels*).) "An implied easement may arise when, under certain specific circumstances, the law implies an intent on the part of the parties to a property transaction to create or transfer an easement even though there is no written document indicating such an intent." (*Id*. at p. 357.)

The creation of an implied easement "requires the existence of three elements: [¶] ' "(1) A separation of title; [¶] ' "(2) [B]efore the separation takes place the use which gives rise to the easement shall have been so long continued and so obvious as to show that it was intended to be permanent; and [¶] ' "(3) [T]he easement shall be reasonably necessary to the beneficial enjoyment of the land granted." ' " (*Id*. at p. 357; see also Civ. Code, § 1104

3

["A transfer of real property passes all easements attached thereto, and creates in favor thereof an easement to use other real property of the person whose estate is transferred in the same manner and to the same extent as such property was obviously and permanently used by the person whose estate is transferred, for the benefit thereof, at the time when the transfer was agreed upon or completed"].)

In *Mikels, supra,* 232 Cal.App.3d at pages 357–358, the court analyzed how the requirements for creation of an implied easement could be satisfied by evidence that real property was subdivided and sold "by reference to a map." In that case, which involved an easement for a road, the court explained, "This scenario fulfills the three elements required for an implied easement to arise in that (1) when the owner of the property being subdivided draws up a map dividing the property into lots divided and encumbered by roads, and then sells lots with reference to such map, the roadways are obvious (on the map) and by their very nature and the fact of the sales of lots clearly intended to be permanent, (2) the sale of lots creates the necessary separation of title, and (3) the easements are reasonably necessary to the lot owners' beneficial enjoyment of their land." (*Id.* at p. 358.) The court explained that "the reference-to-a-map method of creating an easement by implication . . . [¶] . . . presupposes an intent on the part of the original grantor, by depicting the road on the map and by referring to the map in the deed, to create an easement, as opposed to depicting the road and referring to the map for purposes of description only or as an aid in identification, this intent being unambiguously shown by the creation and depiction on the map of new streets, as opposed to the depiction on the map of a street already depicted on earlier recorded documents." (*Id.* at pp. 358–359; see also *Tract Development Services, Inc. v. Kepler* (1988) 199 Cal.App.3d 1374 (*Tract*

4

*Development*) [" 'It is a thoroughly established proposition in this state that when one lays out a tract of land into lots and streets and sells the lots by reference to a map which exhibits the lots and streets as they lie with relation to each other, the purchasers of such lots have a private easement in the streets opposite their respective lots, for ingress and egress and for any use proper to a private way."]; *Day v. Robison* (1955) 131 Cal.App.2d 622, 624–625 (*Day*) [" 'The purpose of the doctrine of implied easements is to give effect to the actual intent of the parties as shown by all the facts and circumstances. Although the prior use made of the property is one of the circumstances to be considered, easements of access have been implied in this state in situations in which there was no prior use. For example, where land was conveyed by reference to a map or plat showing proposed streets, it has been held that the grantee had an implied easement therein for use as a private way.' "].)

In *Tusher v. Gabrielsen* (1998) 68 Cal.App.4th 131, 142–143 (*Tusher*), the court emphasized that " '[t]he purpose of the doctrine of implied easements is to give effect to the actual intent of the parties as shown by all the facts and circumstances.' [Citation.] An easement by implication will not be found absent clear evidence that it was intended by the parties." The burden of establishing the intent of the parties falls on the party asserting the easement and while there must be "clear" evidence of the intent, the standard of proof is by a preponderance of the evidence rather than by clear and convincing evidence. (*Id.* at pp. 144–145.) The court observed that the rule allowing for creation of an implied easement based on reference to a recorded map "is based on the implied intent of the grantor and upon an estoppel resulting from the buyer's reliance on the map showing [the easement] at the time of purchase. [Citation.] Therefore, an easement will not

be implied in favor of the buyer if other facts and circumstances surrounding the transaction indicate that the grantor did not intend to create an easement, or if there is no reference to a map, or if there is no reliance by the purchaser upon the map." (*Id.* at pp. 143–144.) In *Tusher*, plaintiffs sought to establish an implied easement for a pond based, in part, on maps that they claimed depicted a "pond as an improvement inuring to the subdivided property's benefit." (*Id.* at p. 144.) The court affirmed the judgment in defendant's favor noting that the trial court had considered the maps but ultimately concluded that other evidence of the facts and circumstances at the time of the subdivision of the property indicated that the original purchasers of the subdivided property did not reasonably believe they were purchasing property with an easement on the pond. (*Ibid.*)

Thus, to find that an implied easement was created by reference to a recorded map, a court must find: a separation of title; that the separation of title occurred with reference to a recorded map that depicts the easement; that the grantor and grantee intended to create a permanent easement; and that the easement is reasonably necessary to the lot owners' beneficial enjoyment of their land.

### b. *The Corrigans' and Valentine's Property*

The foundational historical facts are not in dispute—rather it is the inferences that can be drawn from those facts that the parties dispute. All of the property involved in this case is located within the Woodside Heights Subdivision, which was established in 1925. In 1958, Jack R. (J.R.) and Mary Dant owned lot 19 and part of lots 1, 2, 3, 4 & 18, Block 2 of the subdivision. A survey map, dated October 1958 and recorded in 1959, depicts the division of their property into several new lots and states that it was prepared in connection with the "resubdivision" of the existing lot. This survey map does

6

not refer to the Dants, rather it states it was prepared "at the request of Arnold W. Scheier," whose relationship with the Dants, if any, was not in evidence. Minutes from a town council meeting on September 15, 1958 reference a "preliminary map of J.R. Dant" in connection with the proposed "resubdivision" of the Dants' property. The survey map depicts utility easements, the type of easements at issue in this case, although the current location is not identical to the location on the map. Those easements are not shown on the map that was prepared in connection with the original subdivision of Woodside Heights. There are no recorded utility easements benefiting the Corrigans' property. A subsequent unrecorded survey in 2011 shows the utility easements, while a 2014 recorded survey prepared for Valentine does not show them.

At the time of the resubdivision in the 1950's, a large house, the Wurster House, was located on what would become parcel C (currently the Corrigans' property). Parcel C is landlocked, with no frontage on a public road. Instead, parcel C is accessed by a long driveway on parcel A. The house sits towards the center of parcel C. The utility easements at issue are located at the shortest distance possible from parcel C to the public road, spanning less than 120 feet of parcel E.

The Dants transferred an interest in newly created parcel C to a third party, the Gladsteins, on October 3, 1958, and later sold their remaining interest in parcel C to a different third party in September 1967. The Dants continued to own the newly created parcel E (what would become Valentine's property) until February 1, 1963, when they sold parcel E to a third party. As noted above, the parcels changed ownership several times before the parties purchased their properties in 2014.

In 2013, prior to the Corrigans' purchase, the owner of parcels A, B and C, Charles Lee, filed a petition requesting that the town certify that parcels A and C, as created by the Dants' 1958 resubdivision, complied with the Subdivision Map Act and the town's subdivision ordinance. On March 26, 2013, the town recorded a document certifying the 1958 survey map as a valid subdivision map. This recorded certificate of compliance attached a copy of the map and certified that "Parcels A and C as shown on that certain Record of Survey being a resubdivision of Lot 19 and portions of Lots 1, 2, 3, and 18, Block 2, Woodside Heights, San Mateo County, California, filed in the Office of the County Recorder of San Mateo County, State of California on July 29, 1959 in Volume 4 of the Licensed Land Surveyors Maps, at Page 54 [4LLS54]" "compl[y] with the State of California Subdivision Map Act and the Town of Woodside Subdivision Ordinance."

Lee testified that when he purchased the property in the 1990's the house was connected to water, electrical, gas and sewage utility pipes running under neighboring Parcel E.[1] Erik Corrigan, a real estate professional, testified that his house was built in the 1940's and that based on the "elbow" shape of the sewer easement, the sewer lines must have been installed at that time along the easement. Corrigan agreed, however, that at the time of his purchase of the property the sewer pipe no longer ran along the full length of the sewer easement and instead cut over to the gas easement as it neared the street. He explained that a metal sewer pipe started at his home and traveled along the sewer easement for a distance, but

---

[1] A second set of utility lines are connected to the front of the house on parcel C and a guest cottage on parcel B. The lines run on an easement over property owned by parties not involved in this action, and these utility easements are not at issue in this case.

where the pipe veered from the easement, the material of the pipe changed to a plastic. Corrigan acknowledged that the plastic sewer pipe was not original.

Corrigan's contractor, Mark Durham, confirmed that part of the sewer line occupies the area that has been shown as a gas easement. He opined that the sewer pipe that exited the house and crossed over Valentine's property was the original sewer line for the house. He also opined that the gas line appeared to be "60-something years old" and "was probably the original gas pipe from the [1950's]." The water lines were also "so old." He explained that they "were getting rusty water out of it like you would out of any old, iron pipe." With respect to the electric lines, the contractor noted that in the 1950's they must have been overhead but that they had been buried within the easement at some point by a prior owner.

James Toby, a civil engineer and land surveyor called as a witness for the Corrigans, examined the 1958 survey map and explained, "normally . . . you wouldn't see a subdivision done on a record of survey. Certainly not nowadays. But back then, it was, kind of, a cowboy-ish way of doing things. It would be common to have maps called different things. So the record of survey is usually not shown as a method of subdividing lots, but in this case, it appeared it did based on the certificate of compliance that I saw from the Town of Woodside. [¶] . . .[T]hese easements look – appear to be created for these lots, specifically for the transmission of utilities." He opined that the "record of survey actually created some of these lots, and, therefore, at the time they created the easements with the record of survey" and that "because of the date and time of this record of survey, I wouldn't find it uncommon for them to create it this way." In response, Alex Calder, the surveyor who prepared the 2014 recorded survey for Valentine, disagreed that the original parcel was subdivided *by* the survey map. He testified that "[t]he deeds

subdivided the land, not the map." He noted that the title company did not find any recorded deeds granting the easements at issue in this case and suggested that "you can't create easements on records of survey. . . . You can't use that as your vehicle. You have to use a different vehicle." Calder agreed, however, that the 1958 survey map was a "graphical representation of the deeded land."

      c. *Valentine's Request for Statement of Decision, the Trial Court's Statement of Decision and Valentine's Objections*

After the trial court announced its tentative decision on the record finding in favor of the Corrigans' on their claim for implied utility easements, Valentine requested a statement of decision identifying 17 issues for the court to resolve, including asking the trial court to make findings regarding the intent of the grantors and grantees at the time of the sale in 1958 and whether the sale of parcel C was made with reference to the survey map. The court ruled on the objections the same day it issued its statement of decision. While the court sustained some objections and revised its tentative decision, it declined to make the findings requested by Valentine as set forth above on the ground that they were "neither relevant nor material and dispositive to the case." The court explained that it "based its decision on the incorporation of the 1958 Brian Survey, recorded in July 1959, into Mr./Ms. Corrigans' and Ms. Valentine's later transactions during the period 2011 to 2014." The court added that while prior use of the easements is one circumstance to consider, "[f]indings & [c]onclusions on earlier events prior to July 1959 are not required for the court's declaration of implied utility easements."

In the statement of decision, the court found and concluded that "implied easements for utilities running through Ms. Valentine's property have existed since 1958 based upon certified subdivision map and that Mr. &

Mrs. Corrigan have rights to those utility easements."[2] The court made the following factual findings in support of its decision: "The Woodside Heights Subdivision Map (Exhibit 11), which included the Parties' properties, was recorded on November 14, 1925. This map, however, does not show any easements. It was not until some 33 years later, in October 1958, that the relevant area was surveyed and re-mapped . . . by Lawrence Brian. [¶] Brian's survey (4LLSS4), recorded on July 29, 1959, shows utility easements one for power and water, one for gas, and one for sewer running from Eleanor Drive and over Defendant's property to Plaintiffs' property." "The 1958 Brian survey, recorded in 1959 as 4LLSS4 and certified as subdivision map by the Town of Woodside in 2013, is the prevailing map. From the fact that it is entitled 'Resubdivision' the Court draws a reasonable inference that Civil Engineer Brian prepared the 1958 survey for the then previous common owner of the properties." The "Corrigans hold rights to those easements as implied easements, and such rights date back to 1958. Likewise, Defendant Valentine's adjoining property is burdened with those implied easements, and she has the obligations that come with them." The court also cited the following trial testimony: "As for other evidence, there was testimony by Mark Durham . . . that the utility lines came into Plaintiffs' property at its West end, suggesting that they connect to Eleanor Drive by running under Defendant's property. There are also photographs in evidence (Exhibits 16,17,18,19 and 20) of visible exposure of the sewer line connecting to a clean-out for that line that is near Defendant's guesthouse. Related mapping of the sewer line (Exhibits 21 and 22), done by camera scanning when the line was

---

[2] The trial court also ruled that the Corrigans were not entitled to relief under theories of equitable easement, express easements, prescriptive easements, or easement by necessity. These decisions are now final.

opened up, show the sewer line going underneath Ms. Valentine's property near the guesthouse and running to further route beneath the Corrigans' property. Additionally, Erik Corrigan testified that in April 2018 there was debris in the water line that came from underneath Ms. Valentine's property, and they discussed the need for possible replacement. There was also testimony from the prior owner of both properties, Charles Lee, as to the physical layout of the utility lines during his ownership from 1993 to 2014, at least what could reasonably be known at the time, on route that was consistent with the locations depicted on 4LLSS4."

### d. Analysis

On appeal, Valentine does not dispute that the 1958 subdivision and sale of the individual parcels at issue in this case create the necessary separation of title for creation of an implied easement. She also does not dispute that the easements are reasonably necessary for the Corrigan's beneficial enjoyment of their land. She argues, however, that the judgment must be reversed because the court's statement of decision reflects a misunderstanding of the relevant law, fails to make all findings necessary to support creation of an implied easement and contains several factual errors. Alternatively, she contends there is no substantial evidence that the parties to the 1958 sale intended to create a permanent utility easement. We agree that the statement of decision is inadequate, requiring reversal of the judgment and remand for further proceedings. As a result, we do not reach Valentine's argument regarding the sufficiency of the evidence.

After a court trial, a party may request that a court issue a statement of decision "explaining the factual and legal decision as to each of the principal controverted issues at trial." (Code Civ. Proc., § 632.) To properly preserve objections on appeal, the objecting party must request a statement

12

of decision pursuant to Code of Civil Procedure section 632 and then, after the statement of decision is issued, bring any omissions or ambiguities to the attention of the trial judge prior to judgment or connection with a new trial motion as required by California Rules of Court, rule 3.1590(d)-(g). (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 982 (*Thompson*).) There is no contention that Valentine did not comply with the required procedure and, thus, the court was required to comply with Code of Civil Procedure section 632 and California Rules of Court, rule 3.1590(f) by issuing a proposed statement of decision followed by a statement of decision and judgment.

"A proper statement of decision is . . . essential to effective appellate review." (*Thompson, supra*, 6 Cal.App.5th at p. 982.) " 'To the court it [the statement of decision] gives an opportunity to place upon [the] record, in definite written form, its view of the facts and the law of the case, and to make the case easily reviewable on appeal by exhibiting the exact grounds upon which judgment rests. To the parties, it furnishes the means, in many instances, of having their cause reviewed without great expense.' " (*Ibid.*)

Although " '[t]he trial court is not required to respond point by point to the issues posed in a request for statement of decision,' " the statement of decision must " 'fairly disclose[] the court's determination as to the ultimate facts and material issues in the case.' [Citations.] 'When this rule is applied, the term "ultimate fact" generally refers to a core fact, such as an essential element of a claim.' [Citations.] 'Ultimate facts are distinguished from evidentiary facts and from legal conclusions.' [Citation.] Thus, a court is not expected to make findings with regard to 'detailed evidentiary facts or to make minute findings as to individual items of evidence.' " (*Id.* at p. 983; *People v. ConAgra Grocery Products Co.* (2017) 17 Cal.App.5th 51, 82 [" ' "

13

'[U]ltimate fact[ ]' " is a slippery term, but in general it refers to a core fact, such as an element of a claim or defense, without which the claim or defense must fail. [Citation.] It is distinguished conceptually from "evidentiary facts" and "conclusions of law." ' ") The trial court's statement of decision in this case fails to meet this standard.

Here, the court applied what it termed "the doctrine of creation of implied easements by map" or a "non-statutory implied easement" based on a "reference to a map" which, the court concluded, provided a "judicially created" alternative to the finding of an implied easement under the Civil Code. While perhaps inartful, the court cited relevant authority, including *Tract Development*, *supra*, 199 Cal.App.3d 1374 and *Day*, *supra*, 131 Cal.App.2d at page 622. In applying this authority, however, the court erroneously concluded that the facts and circumstances of the 1958 sale, which implemented the required separation of title, were not relevant. Contrary to the court's conclusion, the facts and circumstances surrounding the 1958 sale of the property are necessary elements about which the court must make factual findings in order to find the creation of an implied easement, specifically the intent of the parties and separation of title with reference to a recorded map that depicts the easement. (*Tusher*, *supra*, 68 Cal.App.4th at pp. 143–144.) Although events occurring after the sale might support an inference as to the intent of the parties at the time of the sale, nothing after the date of transfer could have created an implied easement.

As a result of the court's conclusion, the court failed to make all necessary findings in support of the creation of an implied easement. Although the court found that the easements at issue "have existed since 1958," the court declined to make the specific findings requested by Valentine as to whether the separation of title was completed with reference to the map

14

and whether the grantor and grantee intended to create permanent utility easements. These findings are properly considered "ultimate facts" because they are necessary elements for the creation of the easements and thus, the failure to make these findings was error. (*Thompson*, *supra*, 6 Cal.App.5th at p. 983.)

Given the trial court's refusal to make the express findings when asked, we are precluded from applying the doctrine of implied findings to remedy the trial court's error. When a proper request for the statement of decision has been made, as in this case, "if the statement of decision does not resolve a controverted issue or is ambiguous, and the omission or ambiguity was brought to the attention of the trial court, 'it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue.' " (*Thompson*, *supra*, 6 Cal.App.5th at p. 981.)

Given the conflict in the evidence, we cannot conclude that the error was harmless. (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108 ["a trial court's error in failing to issue a requested statement of decision is not reversible per se, but is subject to harmless error review"]; *Thompson*, *supra*, 6 Cal.App.5th at p. 983 [when " 'a court fails to make a finding on a particular matter, . . . the omission is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings.' "].)

At trial, to establish the implied easements, the Corrigans relied on, among other evidence: the recorded map being a resubdivision map; the testimony of James Toby that the record of survey created these lots and therefore, the easements were created at that time by the record of survey; the minutes of the city council meeting at which the subdivision and a preliminary map of J.R. Dant were discussed; the Dants retaining ownership

of newly created parcel E; and the testimony of the Corrigans' contractor and other testimony regarding the likely existence of utility lines at the time of the sale.[3]

While this evidence might have supported the omitted findings,[4] Valentine, however, presented contrary evidence and argued that the Corrigans had failed to meet their burden of proof. She relied on the testimony of her surveyor to dispute the import of the map, relied on evidence that the current utility lines were not exactly located in easements depicted on the map and noted the absence of evidence regarding relevant communications at the time of the sale. Valentine argued that the Corrigans' claim for an "implied easement fails because you don't have evidence of the intent of the grantor and grantee when titles are separate[d]. You just don't

---

[3] Prior to oral argument in this case, the Corrigans submitted a letter to this court seeking to introduce copies of the October 1958 deed, as well as subsequent historical deeds for both the Corrigan and Valentine Property. They acknowledge that this evidence existed but was not introduced at trial. We decline their request to consider the new evidence on appeal. (Code Civ. Proc., § 909; *Hill v. San Jose Family Housing Partners, LLC* (2011) 198 Cal.App.4th 764, 770 [Court's statutory authority to take new evidence on appeal "should be exercised sparingly" and only in "*exceptional circumstances*"].)

[4] For example, based upon this evidence and the reasonable inferences, the court could have found that a reasonable person purchasing Parcel C would undoubtably ensure the continued provision of utilities to the home and that the Dants intended to convey the easements. (See *Modesto Irrigation District v. Tanaka* (2020) 48 Cal.App.5th 898, 908–910 [extrinsic evidence at time of purchase in 1890 established farmer's intent to retain riparian rights; noting that "no farmer in his right mind would intend to buy a farm without a right to water"]; *George v. Goshgarian* (1983) 139 Cal.App.3d 856, 863 [subdivider may be estopped from denying the existence of utility easement not mentioned in the deed, if the subdivider knew that the buyer intended to use the powerline on the adjacent lot for power purposes].)

have that evidence. And without that evidence, you can't find an implied easement even by reference to this map because this map was seven months after that transaction, and it's not signed by anybody." Ultimately, the trial court was required to consider all of the evidence and determine whether the separation of title occurred with reference to the map and whether the parties intended to create a permanent easement at the time of the separation. (*Tusher*, *supra*, 68 Cal.App.4th at p. 144.) The court's failure to address the issues raised by Valentine and make findings regarding these required elements requires that the judgment and injunction be reversed.

Ordinarily, the proper remedy for an inadequate statement of decision is to remand with directions to issue an amended statement deciding the omitted controverted issues. (*In re Marriage of Shimkus* (2016) 244 Cal.App.4th 1262, 1279 [remanding with directions for the court to set out a statement of decision as to the basis of its findings]; *Akins v. State* (1998) 61 Cal.App.4th 1, 33 [remanding for the limited purpose of making missing finding].) Under those circumstances, the court could, in its discretion, reopen the case to receive further evidence on the facts and circumstances surrounding the separation of title in 1958 and the intent of the grantors and grantees at that time. (*Guardianship of Brown* (1976) 16 Cal.3d 326, 338, fn. 7; *SSL Landlord, LLC v. County. of San Mateo* (2019) 35 Cal.App.5th 262, 266.) The trial judge in this instance, however, has retired. If the trial judge who presided over the trial is unavailable to prepare an amended statement of decision, a new trial must be conducted. (*Wallis v. PHL Associates, Inc.* (2013) 220 Cal.App.4th 814, 827 [judge who presided over a trial must prepare the statement of decision].) Accordingly, we shall reverse the judgment and injunction, and remand the matter to the trial court to determine the necessary course of action.

*2. Declaratory Relief Re: Telephone and Cable Lines*

The Corrigans' complaint alleges three causes of action. The first seeks to quiet title to the sewer easement. The second seeks to quiet title to the power and water easements. The third seeks to quiet title to the gas easement. The complaint includes no factual allegations regarding telephone or cable lines. Nonetheless, the complaint includes the following prayer for relief: "For an order requiring Defendant to allow Plaintiffs access to her property for the purpose of repairing/updating or replacing any telephone and cable lines that may run under Defendant's property."

In her request for a statement of decision, Valentine asked the court to address "[w]hether a claim by plaintiffs for an easement for telephone and/or cable television lines across the Valentine Property was properly before the Court at trial; if so, whether the evidence established an implied easement for telephone and/or cable television lines; and if so when such easement was created and where it is located?"

As requested, the statement of decision includes the following "order" regarding cable and telephone lines: "On Plaintiffs' Prayer . . . [for] an order requiring Defendant to allow Plaintiffs access to her property for the purpose of repairing/updating or replacing any telephone or cable lines that may run under Defendant's property, those utility lines fall outside of the Implied Easements confirmed above[.] However, the Court Grants further Declaratory Relief finding and confirming that, under their respective legal duties to each other as adjacent neighboring landowners, Plaintiffs Corrigan and Defendant Valentine shall reasonably cooperate with each other for the purpose of repairing/updating or replacing such telephone and cable lines that may run under Defendant's property." Valentine argues that the trial court's "declaratory relief concerning telephone and cable lines is wholly

18

unlawful and, indeed, unconstitutional." The Corrigans do not respond to this argument in their brief.

Valentine recognizes that this "order" is not repeated in the permanent injunction. Nor is there any reference to the cable or telephone lines in the judgment. Instead, after addressing the implied utility easements and Valentine's claim for damages that is not at issue on appeal, the judgment provides that "all other claims presented by the parties are denied."

As a general rule, "courts typically embody their final rulings not in statements of decision but in orders or judgments." (*Alan v. American Honda Motor Co.* (2007) 40 Cal.4th 894, 901.) Consistent with that general practice, the trial court here indicated in its statement of decision that a judgment, consistent with the statement of decision, would be entered and thereafter a permanent injunction would issue.

It does not appear that the court intended, by including the above language in its statement of decision, to make an enforceable order regarding the parties' purported duty to "reasonably cooperate with each other" regarding possible cable or telephone lines. Indeed, Valentine's objection to the proposed statement of decision notes that the court has not, and cannot, find an implied easement as to the cable and telephone lines and expressly asked that "[a]ny injunction entered as a result of the Court's decision should be expressly stated in detail, to avoid unnecessary post-judgment disputes and to properly apprise Defendant and her successors-in-interest of the precise burdens and encumbrances that the Court has placed upon her property through this decision." The court sustained this objection, confirming that it would enter a "separate stand-alone [j]udgment and separate form of [i]njunction."

19

Insofar as the court found that there is no easement with regard to the telephone and cable lines, that decision has not been challenged by the Corrigans on appeal and thus, is final. To the extent the statement of decision contains additional language regarding a purported duty to cooperate as neighbors, that language has not been included in the final appealable orders and exceeds the scope of the complaint. Accordingly, we conclude the language was merely surplusage. (*In re Marriage of Starr* (2010) 189 Cal.App.4th 277, 288 ["immaterial surplusage" in statement of decision may be disregarded.].) On remand, the offending language shall not be included in any amended statement of decision that may be issued.[5]

## Disposition

The judgment and permanent injunction are reversed for a more complete statement of decision, or retrial on the claim for implied easement. Valentine shall recover her costs on appeal.

---

[5] The factual errors in the statement of decision, noted by Valentine on appeal, should also be corrected if an amended statement of decision is issued.

                                      _____

                                      Fineman, J.*

WE CONCUR:

_____

Brown, P. J.

_____

Goldman, J.

---

       * Judge of the Superior Court of California, County of San Mateo, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.