Filed 9/29/25  Shen v. Han CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| CHUNFENG SHEN et al.,<br><br>    Plaintiffs, Cross-defendants<br>    and Appellants,<br><br>            v.<br><br>LENG HAN,<br><br>    Defendant, Cross-complainant<br>    and Appellant. | A170998<br><br>(San Mateo County<br>Super. Ct. No. 19CIV00022) |

This appeal and cross-appeal arise out of a dispute over the proceeds from the sale of a luxury residential property after the parties jointly funded the teardown and rebuilding of a home on the property as a speculative project.  Following a bench trial, the trial court entered judgment for the plaintiffs and cross-defendants, Chunfeng (Alan) Shen and Leia Shen (collectively the Shens), on a detailed statement of decision finding the defendant and cross-complainant, Ms. Leng Han, liable for breaching a contractual covenant of good faith and fair dealing, and awarding just short of a million dollars in damages against her.  The court found no merit to a variety of other claims made by the Shens against Ms. Han or to any of the claims made by Ms. Han against the Shens.  We affirm the judgment.

1

# I. BACKGROUND

## A.

In 2012, Alan Shen, an engineer, and his wife Leia Shen, a private banker, had a "side business" in purchasing, renovating, rebuilding and selling single-family homes for a profit. After an introduction through a mutual friend to Ms. Leng Han, someone the Shens understood to be a "very successful businesswoman" with an interest in residential real estate development, they persuaded Ms. Han to invest with them. At the time, Ms. Han lived in China, though at some later point in the parties' business relationship she moved to the United States, settling in the Bay Area.

The Shens and Ms. Han negotiated the terms of a "friendly" arrangement which they sought to document in writing. Alan Shen prepared and sent to Ms. Han a three-and-a-half page document in Chinese, taken from a form he found on the internet, entitled "Contract Agreement."[1] The Contract Agreement, as translated into English, begins with a brief "Project Overview" stating the parties wish to engage in a "Project" for the "Renovation of Old Single-Building Homes" in "the San Francisco Bay Area." It refers to the contracting parties as Party A (Ms. Han) and Party B (Alan Shen) and states that their "Total Joint Investment" will be in a range of "USD $2,000,000 to $6,000,000."

There follows a series of numbered paragraphs in a section called "Cooperative Matters." These paragraphs state, among other things, that Party B will be responsible for the "implementation, operation and comprehensive management of this project"; that the expected term of the

---

[1] The execution status of the Contract Agreement, which was admitted as an exhibit at trial in the form of an unexecuted document translated into English by a certified translator, is unclear.

project "shall range from 13 to 36 months"; that the parties' "invested funds" shall be "managed" by Party B; that the "posted amounts by the two parties shall prevail to confirm the amount and proportion of investment by the two parties"; and that, upon completion of the project, "dividends" shall be divided in a manner "[p]roportional" to "specific capital from the sale price of the new home" based on the "actual invested funds of the two parties", after "subtracting relevant costs." The "labor" of Party B is a recognized cost, but other than that, the term "relevant costs" is undefined.

Then there is a series of numbered paragraphs entitled "Rights and Responsibilities of Party A." These paragraphs address Party A's right to "engage[] in on-site inspections of the "cooperative project provided by Party B"; responsibility to "[g]uarantee[] the validity of capital" by making available "clean, autonomously allocable funds" in a timely manner; and right, upon "conclusion of the project," to "[r]ecover[] the capital and collect[] dividends." Following that section is a series of numbered paragraphs addressing the "Rights and Responsibilities of Party B." These paragraphs state, among other things, that Party B has the responsibilities to "[g]uarantee[] the validity of a project and perfect[] the lawful procedures for the project"; for "specific project operations"; to "promptly report[] to Party A on the progress of the project"; and to "guarantee the security of [Party A's] invested funds."

There is no integration clause.

**B.**

In 2013, the Shens found a property in Atherton, located at 1 Belbrook Way (1 Belbrook), that they deemed to be suitable for their venture with Ms. Han (the 1 Belbrook project or the project). They retained an architect, obtained necessary permits for a new home on the site, and commenced work. During the course of the 1 Belbrook project—which took longer than

3

expected, and was not completed until 2017—the Shens contributed a total of $7,974,272.92, which came from some cash on hand at the beginning of the project, proceeds from the sale of a prior residential development project in Los Altos, a loan from First Republic Bank, various loans from friends and family, and an additional amount from a source that was never identified.

Ms. Han contributed a total of $1,940,623. Her contributions, however, ceased in 2016, when she stopped sending money to the Shens despite their repeated requests for more funding at a point when they were having difficulty making further contributions of their own and were concerned that they may have to seek bankruptcy protection. Due to Ms. Han's failure to continue investing in the project, the Shens "unilaterally" decided to convert Ms. Han's interest in the project from an equity investment to a loan, which they documented in the form of a secured promissory note for $2 million. They recorded a second mortgage lien securing the note against 1 Belbrook. The lien was placed behind a first mortgage lien held by First Republic Bank, and ahead of liens held by friends and family members who had lent the Shens money for the project. The Shens provided the note and deed of trust to Ms. Han—and Ms. Shen sent Ms. Han a WeChat text pointing out that a deed of trust had been filed in her favor—but there was no response.

It is undisputed that, when finally completed, the 1 Belbrook project was a success. The 10-bedroom home plus guesthouse, designed in a "unique" modern style, was constructed with high quality materials and met the Shens' original goal of building an ultra-premium residential property. It sold for $14.5 million. Although the parties now disagree about the capital contributions to and costs of the project, there is substantial evidence in the record, taking into account the Shens' claimed "sweat equity"—i.e., the value of their management of the project—that the net profit realized on the

4

project was $5,359,748.90. Of this amount—had Ms. Han's equity position not been converted to a loan—the Shens' share would have been 81.37 percent ($4,361,227.68) and Ms. Han's share would have been 18.67 percent ($998,521.22), prorated in proportion to the funds they respectively contributed to the project.

A dispute between the Shens and Ms. Han arose in 2018 in connection with the closing of the sale of 1 Belbrook and the distribution of the sales proceeds. As the closing approached, Ms. Han claimed that she should be paid not just $2 million plus interest as repayment of the secured promissory note she held—for which she submitted a demand to the escrow company—but on top of that an additional $1 million in sharing of profits. She ultimately reduced her profit-sharing demand from $1 million to $640,000, and in order to close the sale the Shens acquiesced and paid her the additional amount she claimed. Ms. Han does not dispute that she was ultimately paid $2,792,222.22, which included both repayment of principal and interest on the promissory note plus the additional payment she demanded. The closing statement of the 1 Belbrook sale lists payment to Ms. Han of $2 million in principal balance, $152,222.22 in interest, and $640,000 as an "Additional Fee".

The Shens later learned, and presented evidence at trial, that in a marital dissolution proceeding following the sale, Ms. Han filed a sworn statement of assets and liabilities that (1) omitted any mention of the $2,792,222.22 payment she received from them at the closing of the 1 Belbrook sale, (2) listed $640,000 in indebtedness *Ms. Han owed to them* (the Shens claimed this contradicted Ms. Han's demand that *they owed her* $640,000 in profit sharing on the 1 Belbrook project), and (3) listed both $1 million in mortgage indebtedness on a home she purchased in Fremont in

5

2016 and $1.5 million in judgment indebtedness she owed in connection with a defaulted loan from a friend, Lihuai Ma, who lent her funds to buy the Fremont house (the Shens claimed it was contradictory to list both the mortgage debt and the judgment debt).

## C.

In 2019, the Shens filed the operative first amended complaint (FAC) in this case asserting four causes of action: (1) breach of contract, (2) fraud, (3) negligent misrepresentation, and (4) fraudulent conveyance. Ms. Han filed a cross-complaint asserting claims for (1) breach of contract, (2) fraud, (3) breach of fiduciary duty and duty of loyalty, and (4) accounting. All claims in the FAC and the cross complaint were tried to the court in January 2024.

## 1.

Prior to trial, upon stipulation of the parties, the court appointed Terry Lloyd to serve as a Special Master under Code of Civil Procedure section 638.[2] The task the court gave Mr. Lloyd was " 'to conduct a forensic analysis and written tracing of the sources and uses of funds for the purchase, redevelopment and sale' " of 1 Belbrook. Mr. Lloyd subsequently submitted his report, which was admitted and considered at trial.

In his report, Mr. Lloyd was able to trace funds totaling $7,535,409 that were used to fund the development of 1 Belbrook. Because of the Shens' intermingling of funds they received for the project, Mr. Lloyd was not able to trace the source of $2,879,487 of funds the Shens claimed was invested in the project. Mr. Lloyd also encountered difficulty finding documentation of costs and expenses. Of the $10,132,637 in costs and expenses the Shens claimed

---

[2] All further undesignated statutory references are to the Code of Civil Procedure.

6

they had incurred on the 1 Belbrook project, Mr. Lloyd was able to document only $6,870,332.

The Shens presented an accounting expert at trial, Mr. Brian Repucci, who analyzed all of the costs and expenses the Shens claimed to have spent on the 1 Belbrook project. Mr. Repuccci, too, like Mr. Lloyd, was unable to find documentation for all of the costs and expenses the Shens claimed. His analysis of the costs and expenses was similar to that of Mr. Lloyd, but he was able to document somewhat more than Mr. Lloyd found—$7,651,405 in supported costs and expenses, against $10,292,441 claimed by the Shens. Mr. Repucci was not asked to attempt to trace or analyze capital contributions to the project.

Ms. Han's accounting expert at trial, Mr. Joseph Tseng, testified that, in his opinion, none of the funds the Shens borrowed from First Republic, friends, and family qualified as equity contributions. He offered the opinion that Ms. Han was entitled to 95 percent of the profits from the 1 Belbrook project and the Shens were entitled to only 5 percent, a percentage based on the $100,000 in cash they contributed to their 2013 purchase of 1 Belbrook at the beginning of the project.

**2.**

In its statement of decision following trial, the court concluded that the written Contract Agreement prepared by Mr. Shen in 2013 was too indefinite to enforce as a contract, but that, based on the parties' course of dealing, the parties had an "implied agreement," "partly written, partly oral, and partly formed by their conduct." Specifically, the court found that the agreement called for "the Shens and Ms. Han to contribute at least $2,000,000 to purchase, redevelop, market, and sell a property, and share any profits pro rata[, and the] Shens would also contribute 'sweat equity' in the form of labor." Having so found, the court did not further specify the exact terms of

7

the parties' agreement; how much of it was written; how much of it was oral; how much of it was based on conduct; or what the respective written, oral, and conduct-based terms were.[3]

While the court found that the parties "materially performed their obligations to contribute to the construction of the home," it also found that "[w]hen it came time to close the sale, Ms. Han demanded first $1 million in addition to the principal and interest for the $2 million loan, then dropping her demand to $640,000 before she would sign the closing documents."

Concluding, essentially, that Ms. Han managed to force the Shens to pay her $640,000 more than they owed her when the sale of 1 Belbrook closed, the trial court found Ms. Han liable to the Shens for breach of the covenant of good faith and fair dealing. The court expressly rejected the testimony of Ms. Han's expert that she was entitled to 95 percent of the profits on the sale—implicitly determining in its damages analysis that she was entitled to no profits at all, only the payment of principal and interest on the $2 million loan.

The court's damages analysis was as follows.

"Both Mr. Lloyd and Mr. Repucci were unable to fully trace all of the expenditures related to the project. Accordingly, the Court's damages analysis relies on Mr. Repucci's more complete data re the expenses and Mr. Lloyd's unrebutted evidence concerning the funding of the project. . . . .

"Mr. Repucci's testimony and exhibits demonstrate that the costs to purchase and construct the property, for which evidentiary support exists, totaled $7,651,405 (he was unable to document over $2.6 million in claimed

---

[3] Nothing in the record indicates that, in the process of the statement of decision's preparation, either of the parties requested that the court make any specific findings about the nature of the "partly written, partly oral" contract terms to which the parties agreed.

8

expenses). The property sold for $14.5 million; closing costs totaled $1,137,591.66. Interest and payments on the four loans other than Ms. Han's totaled $351,254.44. With the exception of the payments to Ms. Han (the $640,000 demand and $152,222.22 interest), the total cost to purchase, build, and sell the property amounted to $9,140,251.10.

"Mr. Lloyd's unrebutted evidence showed that Ms. Han contributed $1,940,623.00, and the Shens contributed $7,974,272.92. [Mr. Lloyd] found an additional $500,000 for which he could not identify the source, [but] there is no evidence that Ms. Han was responsible for that contribution. Accordingly, the Court attributes it to the Shens. [¶] The Shens therefore contributed (through their own or borrowed funds), 81.37% of the total and Ms. Han contributed 18.63%. *Had she received a pro rata share of the net profits, she would have been paid $998,521.22. However, because the Shens converted her contribution to a loan, she was paid $2 million in principal and $152,222.22 in interest.* Substantial evidence exists that Ms. Han's demand to be paid an additional $640,000 was without legal basis and that the Shens were injured by having to pay her demand in order to close the sale." (Italics added.)

On the foregoing analysis, the court awarded the Shens damages of $997,523.29, consisting of $640,000 plus prejudgment interest of $375,523.29.

### 3.

Other than the breach of the covenant of good faith by Ms. Han and the damages awarded for that breach, the court found no basis for relief on any of the other claims in either the FAC or the cross-complaint. To support their fraudulent conveyance claim, the Shens cited and relied on omissions and discrepancies in the statement of assets and liabilities Ms. Han filed in her marital dissolution proceeding, but the trial court found they failed to prove that claim. The court explained, "Even if Ms. Han misrepresented her assets

9

and liabilities to the court in connection with her divorce, or falsely claimed that the funds belonged to her daughter,[4] such misrepresentations alone are not fraudulent transfers. Ms. Han testified that she has not recorded a deed of trust in Mr. Ma's favor on the Fremont property. Further, the Shens did not present evidence that she otherwise encumbered that property or transferred assets to a third party."

Ms. Han now appeals the judgment entered on the court's statement of decision, claiming that the trial court erred in failing to find a breach of contract by the Shens, in rejecting her claims for an accounting and for fraud, and in finding a breach of the covenant of good faith against her. The Shens cross-appeal, claiming that the court erred in failing to find a fraudulent conveyance of assets by Ms. Han.

## II. DISCUSSION

### A.

After hearing two days of testimony and admitting 126 documentary exhibits, the trial court prepared a detailed statement of decision setting forth its factual findings and legal conclusions. Both parties claim error in the statement of decision.

Relying on the idea that a trial court's determinations of the meaning of a written contract is reviewable de novo on appeal, and citing our decision in *Thompson v. Asimos* (2016) 6 Cal.App.5th 970 (*Thompson*)—which addresses the standard of review in appeals from judgments following bench trials where there is a statement of decision under section 632—Ms. Han

---

[4] In her trial testimony, Ms. Han's explanation for the apparently deceptive statements on the schedule of assets and liabilities in her marital dissolution case was that the proceeds she received from the sale of 1 Belbrook constituted her "daughter's inheritance," and as such, were not assets owned by her.

claims the trial court's statement of decision rests on "clear legal error." In effect, she asks us to ignore the statement of decision, place ourselves in the position the trial court was in at the close of the evidence, and prepare our own findings and conclusions without deference to the trial court's work in any respect. The Shens, for their part, do not address the applicable standard of review.

None of the parties appreciates or applies correctly the principles we enunciated in *Thompson*. "In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo. [Citation.] We apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.] Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings. [Citation.] [¶] . . . It is not our role . . . to reweigh the evidence or to assess witness credibility. [Citation.] 'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.' [Citation.] Specifically, '[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.' " (*Thompson*, *supra*, 6 Cal.App.5th at p. 981.)

We also described in some detail the process parties must follow in order to preserve objections to a statement of decision. "Together, sections 632 and 634, as implemented by rule 3.1590(d)–(g) of the California Rules of Court, establish a two-step procedure for requesting a statement of decision and preserving objections for pursuit on appeal. First, following the court's announcement of its tentative decision, section 632 requires a party to

11

specify, in timely fashion and in proper form, 'those controverted issues as to which the party is requesting a statement of decision. After a party has requested the statement, any party may make proposals as to the content of the statement of decision.' This initial step serves the function of advising the trial court of exactly what issues the parties view as materially controverted at the close of the evidence, just as the process of settling jury instructions serves to frame issues for decision by the fact finder in the jury trial setting. Second, section 634 requires that any omissions or ambiguities in the statement of decision must be 'brought to the attention of the trial court either prior to entry of judgment or in conjunction with' a new trial motion (§ 657) or a motion to vacate the judgment (§ 663), thus allowing the court to respond to objections before the taking of an appeal. The second step is not a substitute for the first. Objections are germane only as to issues framed as materially controverted under section 632." (*Thompson*, *supra*, 6 Cal.App.5th at p. 982, footnotes omitted.)

"For the doctrine of implied findings to be disabled on appeal, both steps of the two-step procedure under section 632 and 634 must be followed. [Citation.] Where a party fails to 'specify . . . controverted issues' or otherwise 'make proposals as to the content' of a statement of decision under section 632 (forcing the trial court to guess at what issues remain live during preparation of the statement of decision), or where a party complies with section 632 but fails to object under section 634 (depriving the trial court of the opportunity to clarify or supplement its statement of decision before losing jurisdiction), objections to the adequacy of a statement of decision may be deemed waived on appeal. [Citation.] Because either procedural defect impedes the trial court's ability to fulfill its duty under section 632 and potentially undermines the effectiveness of any statement of decision it

prepares as a tool of appellate review, strict adherence to both steps of the process is necessary before we will reverse the presumption of correctness generally accorded trial court judgments on appeal." (*Thompson*, *supra*, 6 Cal.App.5th at p. 983.)

**B.**

Ms. Han attempts to argue that the trial court's statement of decision is erroneous in numerous respects, but nowhere does she provide any record citations to demonstrate that any of the errors she now asserts were brought to the trial court's attention under the procedures we outlined in *Thompson*, *supra*, 6 Cal.App.5th at pages 981 to 983. It is not enough simply to point out, as Ms. Han does, that she filed unspecified objections (for which she provides no record citation) to the trial court's tentative statement of decision. Under *Thompson*, her burden on appeal is to show that she took steps to specify materially controverted issues under section 632 and then made appropriate objections to any asserted error by the court in addressing those issues. In the absence of such record support, we conclude that virtually all of Ms. Han's claims of error in the trial court's articulated legal grounds for decision have been waived. (*Thompson,* at p. 983.).

Except for the threshold issue of contractual indefiniteness—a legal issue that Ms. Han preserved by arguing below that she proved a claim of breach based on the terms of the Contract Agreement (an argument she renews here on appeal)—the presumption of correctness decides this appeal. Suffice it to say that, on the issue of contractual indefiniteness, we agree with the court's legal assessment that the Contract Agreement is too uncertain to be enforced. Beyond that, and to the extent the trial court went on to find an implied contract, no breach of that contract by either side, and a breach of the covenant of good faith by Ms. Han, we will imply all necessary factual findings to support those conclusions.

13

To illustrate why we must resolve Ms. Han's appeal in this manner, consider her argument based on the text of the Contract Agreement. She argues it is "clear that 'investment of capital' is the basis for calculating profit shares." "This is underscored," she claims, "by reference to the 'actual funds of the two parties.'" According to Ms. Han, the contract language is ambiguous about what the parties meant in stating that Mr. Shen's "labor" would be a recognized element of the profit calculation.[5] She now asks us conduct our own analysis of the profits from the 1 Belbrook project "as a matter of law," using Mr. Lloyd's tracing of funds analysis and a characterization of the capital contributions that gives her 95 percent of the profits from the project (using the same profit split her expert offered at trial), or an alternative capital contribution approach that gives her 65 percent of the profits. She is not definitive about the bottom line she wishes

---

[5] Where ambiguity exists in an unintegrated contract that is partly written, partly oral, or partly based on the parties' conduct—a situation in which the legal meaning of contract terms is intertwined with factual assessment of what the parties said to each other or the parties' conduct—*Thompson* explained the standard of review applicable to the trial court's resolution of ambiguities in contractual terms. "If . . . ambiguity exists, the appellate standard of review turns on whether the trial court based its interpretation on the resolution of conflicts in the evidence. Our review is de novo where the evidence is undisputed [citation], but where the trial court's interpretation rests on its resolution of conflicting evidence, 'any reasonable construction will be upheld as long as it is supported by substantial evidence.'" (*Thompson, supra*, 6 Cal.App.5th at p. 987.) The applicable standard of review for contract interpretation issues of this nature turns on whether, under sections 632 and 634 and rule 3.1590(d)–(g) of the California Rules of Court, the trial court has been asked to construe the meaning of a disputed contractual term. Where that has not happened, any reasonable construction of the contract supported by substantial evidence will be implied. (See *Thompson, supra*, 6 Cal.App.5th at p. 989 ["[W]e conclude that the trial court's interpretation in Thompson's favor—not expressed, but which we imply—is a reasonable one, supported by substantial evidence].)

us to adopt, but she suggests two scenarios, one in which she was underpaid by as much as $6,357,021 and another in which she was underpaid by as much as $1,779,220.

It is not our role on appeal to undertake a fresh analysis of the parties' relative capital contributions to the 1 Belbrook project based on an interpretation of contractual terms the trial court was never asked to construe and then apply the contract as construed, as if we were sitting as the trier of fact. The overreach Ms. Han urges in this respect is especially evident when she asks us to adopt an analysis of her purported profit share that just happens to mirror the 95 percent share her expert, Mr. Tseng, advocated for her in trial testimony the court expressly refused to accept. But more fundamentally than that, Ms. Han assumes that the nearly indecipherable profit-sharing formula in the Contract Agreement governed the distribution of funds to her at the closing of the 1 Belbrook sale. We do not think it did. Because the trial court's damages analysis impliedly accepts Ms. Han's status at closing as a lender, not an equity participant, that formula—no matter how it is construed—had no continuing legal relevance to anything in 2018, whatever the parties subjectively understood it to mean in the Contract Agreement.

Had Ms. Han wanted to preserve an argument that the profit sharing language in the Contract Agreement governed the distribution of proceeds from the 1 Belbrook sale in 2018, she should have asked the trial court to address as a materially controverted issue exactly what "written" and "oral" terms of the parties' contract governed at that time. The trial court's statement of decision is not clear on this issue. Having passed on that issue, Ms. Han now insists that the record cannot support a legal determination that she consented to have her equity converted to a loan. She testified that

15

she never agreed to such a conversion, and she points out that, after the project was completed, the Shens testified they still understood Ms. Han was entitled to receive a profit share percentage. But the key to understanding how the trial court resolved the dispute over profit sharing is in its calculation of damages, and specifically its finding that "[h]ad [Ms. Han] received a pro rata share of the net profits, she would have been paid $998,521.22," but that "because the Shens converted her contribution to a loan, she was paid $2 million in principal and $152,222.22 in interest."

The testimony on this point was confused and contradictory, with both Shens testifying that Ms. Han's interest was converted to a loan "to protect her" because of the risk of possible bankruptcy, while at the same time acknowledging that they understood she retained a proportional profit sharing interest at the completion of the project. But Mr. Shen also testified he "stopped considering Ms. Han a partner" on the project in early 2017, and both of the Shens testified that Ms. Han did not respond when they gave her the promissory note and deed of trust. They both said they tried to reach her to explain the significance of the note and deed of trust, but could not find her. In colloquial terms, they testified, she "ghosted" them at a critical time when the project was in peril and the interests of everyone involved were in danger of being compromised.[6] Moreover, despite Ms. Han's testimony that

---

[6] Ms. Han vigorously disputes this, claims she was always in regular communication with the Shens, and takes the position that their testimony about her disappearing on them is "fabricated." This is not the only evidence adverse to her position on appeal that Ms. Han deals with by claiming falsity. She also claims, for example, that the $2 million secured promissory note to her was "forged and fictitious" and that the deed of trust securing it "falsely" identified her as the trustor. Her opportunity to persuade a court to believe her evidence and not that of the Shens was at trial. Under the substantial evidence test, we do not resolve credibility questions or weigh the strength of properly admitted evidence below.

she never consented to the conversion, the fact is that she resurfaced in 2018 and submitted a demand to the escrow company for payment on the promissory note upon the closing of the sale of 1 Belbrook, which supports an inference of implied consent, since she not only understood she could benefit from having a lien, but she used the lien as leverage to obtain more money from the Shens than she was owed under the note.

Although the court made no specific determination on the issue of Ms. Han's consent to equity conversion and did not explain how it assessed the evidence pertaining to the issue, it calculated damages on the premise that the only payment Ms. Han was owed was on the $2 million promissory note plus interest, implicitly finding that there was, in fact such a conversion. There are any number of legal routes the court could have taken to support this determination, starting with the possibility that, after Ms. Han stopped making contributions to the project in 2016, she waived, abandoned, or was estopped to claim whatever equity-sharing commitments the Shens originally made in 2013. Granted, the court provides no reasoning along any of these lines, but none of the parties appears to have requested a specific legal or factual determination on the highly material issue of conversion of Ms. Han's interest from equity to debt. Which is why, here on appeal, the presumption of correctness is decisive.

Despite the lack of clarity in the statement of decision on the issue of equity conversion, we see substantial justice in the court's implicit determination that Ms. Han was only a lender at the completion of the project. Not only did Ms. Han's conduct belie her testimony, but her attempt to claim profit sharing in addition to repayment on the note—in other words, to have it both ways—plainly cannot be correct. At the end of the project, she was either an equity participant or a lender, but not both. And as the trial

17

court pointed out in comparing the profit split that would have governed in the absence of an equity-to-debt conversion, what the Shens did in giving her a secured promissory note actually left her better off than she would have been had she remained an equity participant. Indeed, if we were to accept Ms. Han's invitation to make a determination on appeal of the parties' relative capital contributions to the project, we would be bound to reverse and remand with instructions to award higher damages to the Shens—the difference between $2,792,222.22 and $998,521.22, plus interest—since substantial evidence supports the 81.37/18.63 percent profit split the court found would have governed in the absence of the secured promissory note.

But we need not go that far. To resolve Ms. Han's appeal, we need only conclude that substantial evidence supports the trial court's finding that Ms. Han was entitled to nothing more than payment as a secured promissory note creditor. Having reviewed the full trial record, we so conclude. From that conclusion, it follows that the record also supports the court's finding that Ms. Han had no basis to claim the $640,000 she extracted from the Shens over and above her repayment on the note—which is the predicate for the bad faith finding against her—as well as the further finding that the Shens were damaged by Ms. Han's bad faith actions.[7]

In support of her argument that the trial court erred in failing to find that the Shens defrauded her, Ms. Han makes two contentions. First, she repeats her argument that she never consented to an equity conversion, and second, she argues that the Shens failed to properly report on the progress of the project and failed to properly document their claimed costs

---

[7] Ms. Han makes no claim of error in the calculation that produced an award of $997,523.29 in damages, including prejudgment interest. She only claims error in the finding that she is liable for those damages.

18

and expenses. We have already addressed and rejected Ms. Han's argument on the issue of consent to equity conversion, so that cannot be the basis for a fraud claim. The trial court's statement of decision does not address her second theory of fraud, but she has waived that argument. Because Ms. Han points to nothing in the record indicating that she specified as a materially controverted issue that a deficiency in progress reporting or documenting costs somehow deceptively induced her participation or continued participation in the project, and then that she objected to the court's failure to address this particular issue in its statement of decision, we will imply adverse findings of no fraudulent intent, no materiality, and no reliance, each of which defeats the claim. Substantial evidence supports these implied findings.[8]

### C.

The Shens' cross-appeal also fails in the face of the presumption of correctness. They, too, provide no citations to the record to show that they specified as materially controverted the issues they now contend the trial court inadequately addressed and then made appropriate objections to the findings on those issues.

The Shens argue that "[t]he transfer of these funds, both the initial $1.9 million put into the [1 Belbrook project] and the $900,000 of profit to her daughter and to another unnamed individual, such that none of it appears on [Ms.] Han's Sworn Statement, are fraudulent transfers that should be voided so that she has funds to pay the judgment in this matter." For this argument the Shens provide no legal citations to support the requisite elements of a

---

[8] We need not address Ms. Han's accounting claim. Having impliedly determined that she was entitled to no equity stake in the profits the Shens realized upon the sale of 1 Belbrook, the court properly rejected that claim as moot.

19

fraudulent concealment claim.  As the trial court correctly pointed out, however, "A fraudulent conveyance is a transfer by the debtor of property to a third person undertaken with the intent to prevent a creditor from reaching that interest to satisfy its claim." (*Yaesu Electronics Corp. v. Tamura* (1994) 28 Cal.App.4th 8, 13; *Kirkeby v. Superior Court* (2004) 33 Cal.4th 642, 648; see Civ Code, § 3439.04.)

In concluding that the Shens failed to prove a fraudulent transfer claim meeting these elements, the trial court made three findings.  First, even assuming that the statements and omissions on the asset schedule Ms. Han filed in her divorce case were misrepresentations, "such misrepresentations alone are not fraudulent transfers."  Second, Ms. Han testified that she had not recorded a deed of trust in favor of Mr. Ma on the Fremont property.  And third, the Shens did not present evidence that Ms. Han otherwise encumbered the Fremont property or otherwise transferred assets to a third party.  Although the first of these findings is conclusory and the second two, though somewhat more specific, are a bit vague, they are all supported by substantial evidence and are sufficient to support an implied determination that the Shens failed to meet their burden of providing the intent element of a fraudulent transfer claim.

## III. DISPOSITION

The judgment is affirmed.  The costs of the appeal are awarded to the Shens.  The costs of the cross-appeal are awarded to Ms. Han.

STREETER, J.

WE CONCUR:

BROWN, P. J.
GOLDMAN, J.

20